UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL NEMIR, M.D.,

       Plaintiff,

v.

MITSUBISHI MOTORS CORP.,

       Defendant.

_____/

Case No. 96-75380

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SANCTIONS
[349/350]**

This diversity product liability lawsuit returns to this Court on remand from the Sixth

Circuit Court of Appeals.  In *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540 (6th Cir. 2004)

(*Nemir IV*), the Sixth Circuit vacated a judgment in Defendant Mitsubishi's favor, entered

after a jury verdict finding that Plaintiff Nemir was not wearing his seat belt at the time of

his December 14, 1993 accident near his home in Maryland, and remanded the case for

a new trial before a different district judge.   The mandate from the Sixth Circuit specifies

that:

> (1) Nemir should have been permitted a reasonable opportunity to contact, free
> of the previous restrictions, the other consumers who filed complaints with
> Mitsubishi;
>
> (2) the district court should have ruled on Nemir's motion for sanctions based on
> Mitsubishi's alleged violations of discovery rules;
>
> (3) Nemir should have been permitted to present his strict liability theory to the
> jury;

(4) Horton [Nemir's expert] should have been permitted to testify both as to causation and to his testing of Nemir's buckle;

(5) Nemir should have been permitted to call Drs. Cooper and/or Manning to testify at trial;

(6) Nemir should have been permitted to impeach the testimony of Dr. Hatsell with the writing and/or testimony of Dr. Spitz; and

(7) Nemir should have been permitted to offer, in response to Mitsubishi's arguments that partial-latching has never happened in the real world, evidence that it declined to perform tests when alerted by customers of the potential for its buckles to unlatch.

*Nemir*, 381 F.3d at 560.

Presently before the Court is Item No. 2: Nemir's motion for sanctions, re-filed in February 2005, and arguing that Mitsubishi should be sanctioned, pursuant to Fed. R. Civ. P. 37(b)(2), for willfully and in bad faith failing to cooperate in discovery.[1] Nemir argues that the appropriate sanction for the alleged discovery violations is entry of a default judgment against Mitsubishi on liability. Alternatively, Nemir argues for a sanction that: (1) precludes all testimony by Mitsubishi's restraint experts Michael Klima and Eddie Cooper; and (2) allows a jury instruction that Mitsubishi and Chrysler (despite Nemir's voluntarily dismissal of all claims against Chrysler) intentionally withheld customer complaints and internal investigations during discovery of this case and that the jury is thus allowed to infer that Mitsubishi and Chrysler intentionally withheld these documents because they were adverse to them.

---

[1] Plaintiff sometimes makes arguments that Defendant DaimlerChrysler (Chrysler) should be sanctioned as well. On the eve of trial, however, Plaintiff voluntarily dismissed Chrysler on May 8, 2002. (DX A, Fresard Aff. ¶ 5 n.1; 5/8/02 Trial Tr. Vol. I at 6.) The Court advised the parties that a formal order of dismissal was unnecessary. (5/8/02 Trial Tr. Vol. I at 6.)

For the reasons stated below, this Court DENIES Nemir's motion.

## I.   Background

A comprehensive review of Nemir's complaint, the parties' discovery motions, and the trial court's decisions on discovery disputes is required here.

### A.  Defect Allegations in Plaintiff's 1996 Complaint

Nemir filed his complaint on November 25, 1996. (DX G.)[2] Nemir's complaint alleged the following.  Nemir was personally injured during a single-vehicle accident near Clear Spring, Maryland on December 13, 1993, while driving a 1991 Dodge Stealth manufactured by Mitsubishi. (*Id.* at ¶ 17.)  The Dodge Stealth "went into a side slide because of the vehicle's light rear end and the ABS brakes were applied causing the driver to lose control although the speed of the vehicle was below the posted speed limit.  The vehicle yawed on its axis with the right front fender striking a fence and fence post on the eastern part of the road and continued on until the right "B" pillar was impacted, the seat belted plaintiff was ejected from his three point seatbelt system and struck the right rear head liner area causing severe injuries, further the airbag did not deploy as designed which would have provided a supplemental method of restraint on the plaintiff." (*Id.*)

The complaint alleged claims of strict liability, negligence, breach of warranty, and punitive damages against Mitsubishi and other entities (which were subsequently dismissed by Nemir before trial.)[3]  Before trial, two of Nemir's claims were also dismissed by the

---

[2]"DX" represents Defendant's Exhibits; "PX" represents Plaintiff's Exhibits.

[3]In addition to Mitsubishi Motors Corporation, the only remaining Defendant, Nemir also brought suit against Mitsubishi Motor Sales of America, MMC Services Inc., MMC U.S.A. Corporation, Takata, Inc., TK Holdings, Inc., Takata Corporation, Takata North America, Inc., Irvin Automotive Products, Inc., Irvin Industries, Inc., Irvine Automotive Industries, Inc.,

district court and affirmed by the Sixth Circuit: (1) Nemir's punitive damages claim was dismissed, based on the district court's finding that Michigan law applied to that claim, and Michigan law does not allow punitive damages; and (2) Nemir's design defect/failure to warn claim alleging that the "fasten seat belt" failed to go on when the seatbelt was partially engaged was dismissed because Nemir's expert testified that "that it would not be possible to 'fix' that problem and that an alternative design is not available." *Nemir v. Mitsubishi*, No. 99-1907, 2001 WL 223775, *8 (6th Cir. March 2, 2001) (*Nemir I*).  Before trial, Nemir also notified the Court that he wanted his lawsuit decided under Maryland's substantive law of strict liability, not negligence law.  (Docket No. 20, 9/10/97 Pl.'s Choice of Law.)

The claims asserted against Mitsubishi alleged a wide range of design defects including the Dodge Stealth's:  (1) uncrashworthy design and manufacture (¶ 25); (2) "ABS system which resulted in an unreasonable propensity to put the vehicle in a yaw mode" (¶ 27); (3) "restraint system, including all of its components such as the belt webbing, retractors, anchors and anchor points, as well as the overall design and geometry of the system, were inadequate to reasonably restrain and protect occupants when exposed to foreseeable crash forces in frontal and side impact accidents" (¶ 28); (4) restraint system which "lacked excursion-mitigating devices, such as web clamps, pretensioners, seat-integrated belts, and other similar devices which can prevent or limit excursion of occupants during such accidents" (¶¶ 29-30); (5) "driver side airbag failed to deploy which would have

---

Halle, & Stieglitz, Inc., NY Irvin Industries, Inc., Michigan, and Chrysler Corporation.

All Defendants other than Mitsubishi Motors Corporation were dismissed before trial. (Docket No. 19, 8/28/97 Order dismissing all Defendants except Mitsubishi Motors and Chrysler with prejudice and without costs; DX B, 5/8/02 Trial Tr. at 6.)

prevented the Plaintiff's initial forward excursion" (¶¶ 31, 33); (6) "seat and related components were inadequate to reasonably prevent or limit occupant excursion or to reasonably provide energy absorption" (¶ 32); and (7) "design failed to incorporate other designs and technologies which could protect occupants form [sic] foreseeable crash forces in foreseeable single car accidents"  (¶ 34).

There was no specific mention of a design defect as to the Dodge Stealth's seat belt buckle.

On July 9, 1997, an order was entered denying Mitsubishi's motion to transfer venue to the district court in Maryland.

## B.  Discovery Disputes From July 1997 Through February 1999

On July 22, 1997, Mitsubishi served Nemir with a first set of interrogatories and document requests.  Interrogatory Nos. 25-33 requested information regarding the factual basis for and clarification of Nemir's defect claims.

On August 28, 1997, an order was entered providing that (1) Nemir shall withdraw his Rule 11 motion for sanctions against Mitsubishi with regard to its motion for transfer of venue; (2) determining that, because Maryland law applies, the parties shall submit briefs on Maryland law with respect to the specific theory of liability designated by Nemir; (3) Nemir shall, on or before September 10, 1997, file a notice with the Court designating which theory of liability, strict liability or negligence, he will seek at trial; (4) dismissing all Defendants, except Mitsubishi Motors Corporation and Chrysler, with prejudice and without costs.  (Docket No. 19, 8/28/97 Jt. Order Re: 6/27/97 Case Mgmt. Conf.)

On September 2, 1997, Nemir served Mitsubishi with responses to its first set of interrogatories and document requests.  Nemir objected that Interrogatory No. 25, seeking

5

the factual basis of his defect allegations, was too broad and further responded that all documents relating to the facts that formed the defect allegations in his complaint where in Chrysler's exclusive possession.  (DX J.)  As to Interrogatory Nos. 26-33 seeking information on the specific nature of Nemir's alleged seat belt, air bag, and other structural defects, Nemir stated that he could not respond with any specificity until he "has an opportunity to observe the defendant's design failure mode analysis, and the failure mode analysis product procedure & protocol," that "the plaintiff believes that the seatbelt as designed was defective, furthermore, so was the air bag. . . . [and] [t]he evidence is in the seatbelt and the air bag; and that he will supplement their [sic] answer . . . after the deposition is taken of those persons involved in failure mode analysis and design mode analysis of the restraint system as well as a generalist in the area."  (*Id.*)  As to his seat belt defect claim, Nemir responded that he was claiming that "the seatbelt failed to hold him on impact, plus it was not fit for its intended purpose.  The precise nature of the defect can not be determined at this time or until a sufficient discovery has been had into the restraint system provided by the defendant."  (*Id.*)

On September 19, 1997, Mitsubishi's counsel wrote to Nemir's counsel regarding outstanding discovery issues including, the scheduling of fact witness and Rule 30(b)(6) depositions, inspection of Nemir's vehicle, Nemir's retention of expert witnesses, and Nemir's failure to adequately respond to Mitsubishi's first set of interrogatories and document requests; i.e., Interrogatory Nos. 8, 10, 11, 17, 18, 19, 21, 25-33, 37, 42, and 45 and Request Nos. 15-17.

On September 24, 1997, Nemir's counsel wrote to Mitsubishi's counsel promising that "we will work diligently to supply you with more meaningful responses", taking issue with

6

Chrysler's answers to Nemir's first set of interrogatories and requests to admit, taking issue with Mitsubishi's suggestions as to Rule 30(b)(6) depositions, proclaiming that the December 31, 1997 discovery cut-off date unrealistic, and asking defense counsel to join Nemir's counsel in asking Judge Feikens to extend the discovery period.  (DX L.)

On September 29, 1997, Nemir served Mitsubishi with his first set of interrogatories and requests for production of documents.

On October 31, 1997, Mitsubishi responded.  At issue here are Mitsubishi's responses to Document Request Nos. 15 and 26:

**Request No. 15:**
All documents relating to or consisting of studies, literature, surveys, tests, analysis, research or <u>investigations of any nature</u> conducted by you or anyone else regarding the seatbelt system used in the subject vehicle, both front and rear.

**Response No. 15:**
MMC objects to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, unlimited in time and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  MMC further objects to the extent that this Request is not sufficiently limited to the facts and circumstances of this case, which MMC currently understands involved impacts to the passenger side front quarter-panel and to the passenger side door at or near the B-pillar.  Subject to and without waiving its objections, see MMC's responses to Request Nos. 1 through 6 and 8 though 10.[4]

**Request No. 26:**
All documents containing, referring to, or relating to <u>any claims, assertion, or report by any individual or entity that any Dodge vehicle using the same or similar seatbelt system wherein a front seat belted passenger received a serious or fatal injuries</u>.

---

[4]MMC's Responses 1-6, 8-10, state that MMC will supplement its responses to all requests seeking documents that contain trade secrets or other confidential research, development technical or commercial information, as appropriate, after entry by the court of an appropriate protective order.

**Response No. 26:**
MMC objects to this Request on the grounds that it is vague, overly broad, unlimited in time and seeks information not reasonably calculated to lead to the discovery of admissible evidence. MMC further objects to the extent that this Request seeks documents in the possession, custody or control of others. MMC further objects to this Request on the grounds that the phrase "similar seat belt system" is undefined, thereby rendering this Request vague and ambiguous. MMC further objects to the extent that this Request is not sufficiently limited to the facts and circumstances of this case, which MMC currently understands involved impacts to the passenger side front quarter-panel and to the passenger side door at or near the B-pillar, and to the extent the Request seeks information related to vehicles different from the subject vehicle.

(PX 6 at pp. 11, 14-15 (emphasis added).)

Based on discussions with Nemir's counsel, Mitsubishi understood that Request No. 15 sought information that related to technical questions and matters arising as a result of inquiries prompted by MMC or Chrysler, rather than as seeking information about claims or reports of injury initiated by others. (DX C, Craig John Aff. at ¶¶ 21, 23, and 28.)

Likewise, based on discussions with Nemir's counsel, Mitsubishi understood that Request No. 26 sought information that related to claims or reports of injury initiated by sources other than MMC or Chrysler and did not seek information regarding lawsuits that had already been filed. (*Id.* at ¶¶ 21, 23, and 31.)

On November 21, 1997, Nemir filed a motion to continue dates, stating that both Plaintiff and Defense counsel "have been working diligently at the discovery aspects of this case." (Docket No. 22, Pl.'s Mot. at 2.)

On December 5, 1997, Nemir's counsel sent Mitsubishi's counsel a letter with a point-by-point discussion of why Mitsubishi's responses to Nemir's first set of interrogatories and document request were inadequate. (DX C, John Aff. at ¶ 40.)

At a December 22, 1997 discovery meeting with Nemir's and Mitsubishi's counsel, Nemir discussed a new theory for seat belt defect; i.e., there had been a recall of Takata Model 52 seat belt buckle involving "chipping" and that "chipping" caused the buckles to experience a "false latch" condition, which Nemir's counsel said he suspected happened to the seat belt buckle in Nemir's vehicle, a claim different from that later relied upon by Nemir's expert at trial who admitted that there was no evidence of broken buckle parts found in Nemir's seat belt buckle.  (DX C, John Aff. at ¶¶ 43, 50; Horton 12/28/98 Dep. at 168.)

Also at that December 22, 1997 meeting, the parties agreed on the following discovery sequence:  (1) Nemir would supplement his discovery responses; (2) Nemir would supplement his document request responses; (3) Nemir would notify Mitsubishi by letter of his testifying experts; (4) the parties would work out a protective order; (5) Mitsubishi would supplement its interrogatory and document request responses; (6) Nemir could serve additional discovery requests; (7) Nemir would serve Rule 30(b)(6) deposition notices; (8) Nemir's experts would be deposed; and (9) MMC's experts would be deposed.  (*Id.* at ¶ 45; DX M, John's handwritten notes from 12/22/97 meeting.)

On January 22, 1998, Nemir served Mitsubishi with a Second Document Request. At that time, Nemir had not supplemented his discovery responses, had not provided Mitsubishi with a list of its experts, and had not entered into a protective order.  (DX C, John Aff. at ¶ 47; DX N, Pl.'s Second Request for Production of Documents.)

On February 18, 1998, Mitsubishi notified Nemir's counsel that Mitsubishi would produce confidential documents responsive to Nemir's first document requests once the protective order, currently being negotiated by the parties, was entered.  The letter also

9

noted Mitsubishi's surprise that Nemir had deviated from the agreed-up discovery sequence by serving a second document request without first supplementing Nemir's answers to Mitsubishi's first set of interrogatories seeking information on Nemir's liability theories.  (DX O, 2/18/98 letter.)

On February 18, 1998, Nemir's counsel responded, claiming that Mitsubishi's account of the December 22nd meeting was "fictionalized", accusing Mitsubishi of "stonewalling" and playing "fast and lose Ala [sic] Frank and Jesse James. . . .", and threatening to file a motion to compel.  (DX P, 2/18/98 letter.)

On February 19, 1998, Mitsubishi's counsel responded with a letter denying that it was "stonewalling" or "fictionalizing" the December 22, 1997 discovery meeting, enclosing his handwritten notes of the December 22nd meeting, supporting his claim as to the agreed-upon discovery sequence.   That letter once again requested that Nemir supplement his discovery responses so as to formally clarify all his defect claims and warned that all defect claims not identified, even though asserted in the complaint, would be considered abandoned.  (DX Q, 2/19/98 letter.)  Mitsubishi's counsel reiterated that he had previously "pointed out that your supplementation would indicate your intent to pursue those claims, it would place those claims in issue in this lawsuit, and discovery as to those claims from my client could then proceed."  (*Id.* at p. 2.)

Nemir's counsel responded that he would update his responses to Mitsubishi (but did not say when) and, at the same time, threatened Mitsubishi with a motion to compel if it did not supplement its responses to Nemir's first document request and respond to his second document request.  (DX R, 2/19/98 letter.)

10

On February 23, 1998, Mitsubishi served Nemir with its responses to Nemir's second document request.  At issue here are Mitsubishi's Responses to Request Nos. 76 and 77:

Request No. 76:
Produce all tests, data, reports, procedures or protocols involved in the analysis of "partial latch" or "false latch" phenomenon in the series TK-520 including the TK-523 specifically involving the belt tongue and the buckle mechanism.

Response No. 76:
MMC objects to this request on the grounds that it is overly broad, unduly burdensome, unlimited in time, unlimited in scope and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  MMC further objects to the extent that this Request seeks information in the possession, custody or control of others.  MMC also objects to the extent this Request seeks information related to vehicles different from the subject vehicle. See also General Objections and Preliminary Statement and Objections. Subject to and without waiving its objections, MMC reserves the right to supplement its response, as appropriate, after submission by plaintiff of supplemental responses to interrogatories and requests for production.  MMC further objects to the extent this Request seeks information related to components and issues other than the components and issues in this case, which MMC currently understands to include alleged occupant excursion from the driver's three-point belt system.

Request No. 77:
Produce the engineering drawings for the TK-520 series and documents denoting modifications, alterations or changes.

Response No. 77:
MMC objects to this request on the grounds that it is overly broad, unduly burdensome, unlimited in time, unlimited in scope and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  MMC further objects to the extent that this Request seeks information in the possession, custody or control of others.  MMC also objects to the extent this Request seeks information related to vehicles different from the subject vehicle. See also General Objections and Preliminary Statement and Objections. Subject to and without waiving its objections, MMC reserves the right to supplement its response, as appropriate, after submission by plaintiff of supplemental responses to interrogatories and requests for production.  MMC further objects to the extent this Request seeks information related to components and issues other than the components and issues in this case, which MMC currently understands to include alleged occupant excursion from the driver's three-point belt system.

11

(DX S, Mitsubishi Responses at 24-25.)

On March 2, 1998, the Court entered a Stipulated Protective Order.  (Docket No. 28, 3/2/98 Stipulation and Protective Order.)

On March 2, 1998, Nemir served Mitsubishi with supplemental responses to its first set of interrogatories.   (Docket No. 30, Defs.'s Mot. to Compel, Ex. 8.)   Nemir's supplemental answer provided additional responses to Mitsubishi's Interrogatory Nos. 28, 29, 30, 37, and 39 (a)-(o).  As to Nemir's design defect claims, Nemir responded that:

Interrogatory No. 28 [Re: Alleged Design Defects]:
State whether you claim that the subject vehicle or any of its component parts were defectively designed and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend that the subject vehicle or any component thereof should have been designed differently.

Response No. 28:
It is on information and belief that the plaintiff believes that the seatbelt as designed was defective, furthermore, so was the air bag.  The evidence is in the seatbelt and the air bag.  [Nemir] will supplement their [sic] answer to this interrogatory after the deposition is taken of those persons involved in failure mode analysis and design mode analysis of the restraint system as well as a generalist in the area.

Supplemental Response No. 28:
[Nemir]'s claims sounds [sic] in strict liability and concern liability as a complete whole as to the entire vehicle with areas of concern in the vehicle's interior and exterior, with special attention directed to the following:

1.  The failure of the airbag to deploy;
2.  The failure of the seat belt system to hold Dr. Nemir;
3.  The failure of the seat to maintain its configuration on body impact;
4.  The interrelationship between the seat belt and the seat;
5.  The failure to have a web grabber or web sensitive device or pretensioner in the seat belt system;
6.  A defective, by design, seat belt buckle;
7.  The failure to warn as to the ABS and how it is to be used;

12

8. The lack of crashworthiness of structural components of the vehicle including "B" pillar, "A" pillar, the door assembly, rocker panel, trim panels, the floor pan, and the unfriendly interior which may have had some determinate enhancement of [Nemir]'s injuries.

[Nemir]'s review of the subject vehicle has indicated to [Nemir] that the aforementioned areas of concern make up the composite allegations of design defect.

Interrogatory No. 29  [Re: Alleged Manufacturing Defects]:
State whether you claim that the subject vehicle or any of its component parts were defectively manufactured and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend that the subject vehicle or any component thereof should have been manufactured differently.

Response No. 29:
[Nemir] claims that the seatbelt failed to hold him upon impact, plus it was not fit for its intended purpose.  The precise nature of the defect can not be determined at this time or until a sufficient discovery has been had into the restraint system provided by the defendant.

Supplemental Response No. 29:
[Nemir] will aver that there is an inherent problem in this seat buckle, which was designed by Mr. Takata, which permits it to unlatch.  If the Defendants through their counsel would quit obfuscating and bitterly "stonewalling" on discovery, we may proceed so that meaningful supplements can be given.

Interrogatory No. 30 [Re: Alleged Defective Testing]:
State whether you claim that the subject vehicle or any of its component parts were defectively tested and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend that the subject vehicle or any component thereof should have been tested differently.


Response No. 30:
[Nemir] can not answer interrogatory #30 with any specificity because [Nemir] not [sic] aware of the type of testing that was conducted on this seatbelt or air bag.

13

Supplemental Response No. 30:
[Nemir] again is waiting for defense counsel and their clients to stop "stonewalling" and obfuscating meaningful discovery.

Interrogatory No. 37:
State the following for each expert [Nemir] plans to call at trial: (a) his/her name and business address, and the name of the company with whom he/she is affiliated; (b) his/her field of expertise; (c) whether he/she has been contacted by [Nemir] or [Nemir]'s representative; (d) whether he/she has been retained by [Nemir] or [Nemir]'s attorneys; (e) the identity of all persons with whom he/she has consulted in connection with his/her investigation; (f) whether he/she has formed any opinions with respect to this action; (g) the dates when he/she formulated the opinions; (h) the substance of his/her opinions; (I) each fact on which he/she has relied in forming his/her opinions; (j) in chronological sequence, according to the time of its occurrence, each relevant event, in his/her opinion, which caused or contributed to the injuries of [Nemir]; (k) the name, address and telephone number of each recipient of each opinion; (l) whether he/she has prepared a written report with respect to this matter, and if so, the dates of all reports, the substance of each report, and the names and addresses of all persons who have copies of the reports; (m) whether [Nemir] will attach to [Nemir]'s answers to these interrogatories a copy of each expert's opinions and reports; (n) the substance of any other testimony expected from the expert; (o) whether his/her investigation, opinions, and conclusions are finalized; and (p) if the answer to the foregoing subinterrogatory is in the negative, state in detail exactly what investigation, study or testing remains to be completed and when it will be completed.

Response No. 37:
[Nemir] has not retained experts as of this date (a-p).

Supplemental Response No. 37:
[Nemir] objects to the interrogatory as posited in that meaningful discovery requests have been served upon these Defendants', [sic] who have collectively indicated a non-willingness to engage in meaningful discovery or produce any documents. Therefore, [Nemir]'s response to the interrogatory will be predicated upon the information known to date bearing in mind that the Defendant is the designer and manufacturer of the vehicle and holds all the necessary documents to support [Nemir]'s experts theories.

Interrogatory No. 39 (a-f):
If there was any policy of insurance providing coverage of [Nemir] at the time of the accident state: (a) the name and address of the insurer; (b) the applicable policy number; (c) the effective dates of the policy; (d) the policy limits; (e)

14

whether plaintiff or any representative of [Nemir] reported or made a claim on such policy; and (f) the date and claim number of any such claim.

Response No. 39 (a-f):
(a) Blue Cross/Blue Shield; (b) will obtain; (c) will obtain; (d) there were no policy limits; (e) yes; and (f) this will be made available, it was not within [Nemir]'s knowledge at the time that he submitted his answers to these interrogatories.

Supplemental Response No. 39(a-o):  [Sic]
Having given the aforementioned caveat in response 37 [Nemir]'s experts will/or may testify within the four corners of [Nemir]'s Complaint which is very specific.

* * *

Thomas D. Horton . . . . will testify in the area of sled testing seatbelt systems of vehicles, passive restraints (2 and 3 point), airbags, passive interiors/interior components, FMVSS 208, 209, 210 testing and compliance.  Mr. Horton will also testify in the area of specific problems dealing with the Takata seatbelt system as designed including the seatbelt buckle and its propensities to half latch and release.  Mr. Horton will address the airbag non-deployment problems with the subject vehicle.

* * *

John Marcosky . . . . will offer opinion relative to matters external to the passenger compartment including vehicle structural location, design, and manufacture.

(Docket No. 30, Ex. 8.)

On March 5, 1998, Mitsubishi served on Nemir documents responsive to Nemir's first document request.  (Docket No. 29, Proof of Service.)

On March 11, 1998, Mitsubishi's counsel wrote to Nemir's counsel, notifying Nemir that his supplemental responses to Mitsubishi's first set of interrogatories were inadequate, that Nemir "bald assertions" about his defect claims prevented Mitsubishi from adequately responding to Nemir's document requests, and that Nemir's responses failed to inform whether he was pursuing design defect, manufacturing defect, or defective testing claims. Likewise, Mitsubishi informed Nemir that its response to Interrogatory No. 37 regarding his

15

experts failed to provide information requested regarding each expert's opinion. Finally, Mitsubishi noted Nemir's failure to supplement responses to Interrogatory Nos. 8, 11, 18, 19, 21, 25-27, and 31-33. Mitsubishi's counsel suggested another discovery meeting to discuss pending discovery disputes. (DX V.)

On March 26, 1998, Mitsubishi's counsel wrote again to Nemir's counsel, confirming recent discovery discussions where Nemir promised to supplement responses to his discovery requests so as to explain his current theories and "suspicions" . . . so that Mitsubishi would be in a better position to address the substance of Nemir's recent discovery requests and deposition notices, and requesting that Nemir's counsel refrain from proceeding with depositions until counsel could work together to craft notices to which Mitsubishi could respond meaningfully and substantively. (DX W.)

On March 30, 1998, Nemir's counsel responded by letter that:

Since our discussion I had time to ruminate on matters that you requested of me. I must tell you from the beginning I find you to be a very professional fellow, who wants to do the right thing for your client.

As I explained to you, which I think is very clear, that Dr. Nemir did not design, manufacture, or test the Stealth or its components; Mitsubishi did. I can therefore only give preliminary impressions, which at this point cannot be opinions with any reasonable degree of engineering certainty.

The vehicle as designed is a low center of gravity sports car which was marketed on its sports car features including a power-up-engine and a matching drive train to facilitate the image projected.

The automobile accident, from the factual standpoint, appears to be one where the driver upon coming around the curb on a rather serpentine two-lane asphalt road must have lost, albeit momentarily, traction and the vehicle rotated in a counter-clockwise yaw with the right front fender making first contact with a fence and/or fence post and the vehicle then pivoting on the lateral axis impacting a tree in the area of the "B" pillar, rocker panel, floor pan, and front of the rear quarter panel. There was also some sub-frame involvement.

16

A cursory view of the body components indicate some severe welding problems including "unzippering" of the spot welds.  This phenomenon may considerably reduce the structural integrity of the componentry and appreciably change the computation of force, crush and the ultimate delta v in such a way as to reduce the amount of force to produce such damage.  Therefore assembly, materials specifications and welding requirements including quality control, and I'll figure in as well as (AWS) "American Welding Society" S.A.E. or ASM standards are important.

The next item of interest and concern is the seat belt mechanism.  This is a standard three point system with floor mounted anchorage using a "vehicle sensitive" ELR.  The vehicle did not have either a web-grabbing or pretensioner system which may have some consideration in the performance of the upper torso restraint.

We believe that the seat belt system as designed, other than not having a proper upper torso locking system as built, has a problem with incomplete or half latch of the buckle mechanism.  Further the system lacks a cinch lap buckle which, I may propose, is a violation of FMVSS 208 and 209.

The positioning of the seat belts, their geometric configurations, the seat angles, the coefficient of friction and construction of the seat and all the things I have asked for are things that I think are requisite for my seat belt expert and my biomechanical engineer.

You will agree that the laws of physics are critical to our analysis.  The construction of the passenger envelope is critical to our analysis as well.

It is also critical to our analysis that we review and inquire into FMEA "Failure Mode Effects Analysis" as it relates to the componentry involved.  I assume Mitsubishi not only follows FMEA but ISO 9000.

Without the information, that only the Defendant has, [Nemir], though his experts, then can work up an understandable composite of opinions which should (from [Nemir]'s standpoint) satisfy the threshold prima facie requirements and meet the dictates of Daubert.

Negligence and strict liability, as this attorney looks at them, we are governed by the "almost any conceivable situation" analysis and are not governed by the engineering standards of exactitude; therefore, [Nemir] in the early stages of a case like this is in no position to reduce his theories to exactitude.  The Court Rules do not require such at this point.

A perfect example is the airbag.  Why did the airbag fail not [sic] deploy?  How is [Nemir] going to find out?  What does [Nemir] have to know?  What is the

17

testing that the Defendants conducted to tell us how this airbag failed during the offset frontal impact?  What went into the FEMA for the airbag:  (1) state of the art; (2) system design; (3) design; (4) process design; and (5) technical inquiry.

<u>I will go into all of the systems discussed [sic] seat belt; airbags; vehicle construction concerning the vehicle as a totality viewed by a body engineer.</u>

As I have stated, I am extremely reluctant to put any of my impressions into answers to interrogatories and I do not intend, at a later date, to be "boxed in" by these answers.  Furthermore, I believe I have met the requisite criteria in FRCP 26 to date.

I will, in good faith, with a caveat that [Nemir]'s theories (which are not recent but have been the same all along) are preliminary impressions.

(DX X (emphasis added).)[5]

On April 23, 1998, Mitsubishi's counsel wrote to Nemir's counsel asking whether Nemir was going to supplement his Answers to Mitsubishi's first set of interrogatories with the information contained in his March 30, 1998 letter.  (DX Y.)  Nemir's counsel did not respond.  (DX C, John Aff. at ¶ 23.)

On May 22, 1998, after Mitsubishi's counsel unsuccessfully attempted to resolve pending discovery issues, it filed a motion to compel supplemental responses to Mitsubishi's first set of interrogatories and document requests.

On June 1, 1998, Nemir's counsel wrote to Mitsubishi's counsel, stating that "this letter and its accompanying documents will serve as a complete disclosure of all relevant, non-privileged, information presently available to us", promising that "[a]s more becomes

---

[5]These "preliminary impressions" came on March 30, 1998; 51 months after Nemir's accident and more than 16 months after Nemir filed this action.  Pursuant to Judge Feikens' January 29, 1998 Scheduling Order, discovery was to close on June 30, 1998, the final pretrial order was due on July 16, 1998, and trial was set for August 11, 1998.

18

available, it too will be forwarded your way", and demanding that Mitsubishi "'put-up or shut-up'" and likewise respond to outstanding discovery requests. (Docket No. 37, Ex. 1.)[6]

In his June 1st letter discussing his outstanding discovery responses to Mitsubishi, Nemir's counsel provided that:

> We have a doctor who says he was wearing his belt when he was involved in a crash. The first point of impact is indisputably the front right fender. The force of that impact was obviously significant because it dramatically changed the trajectory of the vehicle. His belt was not engaged when he was found, and to this day his air bag has still not deployed. If either of the items of safety equipment which Dr. Nemir bought and paid for had operated appropriately, Dr. Nemir's grave and devastating injuries would have been prevented. Moreover, the skid pattern clearly denotes a brake pumping action by Dr. Nemir in his attempts to avoid the accident. The ABS in this situation operated to the Plaintiff's detriment -- not benefit.

> These facts are clear, established by mere common sense, and will be corroborated by each and every expert witness, plaintiff or defense, that is called in this case. Given the facts in this case, the allegations in the complaint are certainly, and at a minimum, bonafide issues of dispute, cogently stated and supported in fact. Any alleged deficiency in these allegations can only be cured by your living up to your promises and producing the information which will allow out experts to flesh them out. If they are fallacious as you contend then you should have no problem guiding us to the information which will assist us in dismissing those counts. . . .

> For example, our accident reconstructionist can indicate the speed of the vehicle as well as the point and force of the initial impact. Similarly, our biomechanical expert can illustrate how the air bag would have protected Plaintiff from his injuries had it deployed. Plaintiff did not, however, design, build, test and manufacture this vehicle -- MMC did. Without the information which MMC, and only MMC possesses, no meaningful progress can be made as far as determining how, where and when the air bag should deploy on this particular vehicle or how, where and when it should have been designed to deploy.

> Similar situations exist as far as braking, structural integrity and the seat belt system are concerned. The only thing holding back concise and definite statements by our experts as to what transpired in this case is your client's

---

[6]The Court was unable to locate Nemir's June 1, 1998 supplemental responses in the record and neither party has included them as an exhibit here.

outright refusal to make meaningful discovery. We informed you of this in our March 30, 1998 letter and still maintain that we will be unable to provide you with much more information until you've lived up to your side of the bargain.

(*Id.* at p. 2 (emphasis added).)

On June 5, 1998, defense counsel responded that Nemir's June 1, 1998 supplemental responses still failed to state that factual basis for the defect claims alleged in his complaint, that Nemir had not demonstrated that the information he sought was relevant to his claims and not "merely an unbounded fishing expedition." (*Id.*) Mitsubishi's counsel pointed out that:

> Based on your discovery responses, it appears that in the four years since the subject incident, plaintiff has not bothered to have the majority of his experts inspect the subject vehicle or accident scene, nor has he obtained any opinions regarding how the subject accident occurred or how the subject vehicle performed in the accident. Thus, other than the fact that your client was injured, you have offered no basis for the numerous defect allegations about which you seek voluminous discovery. The unverified assertions in plaintiff's supplemental discovery responses and the unsupported representations in your June 1, 1998 letter, simply do not rise to the required level of 'disclosure' that you appear to believe has been provided. In short, it is clear that you are still just fishing and thus we will apparently have to impose on the court to determine the appropriate scope of discovery at this time in light of the deficiencies that permeate your responses.

(*Id.* (emphasis added).)

On June 9, 1998, Nemir filed a Motion to compel adequate and sufficient Rule 26(a) disclosures and for Rule 37 sanctions for Defendant's failure to comply with Rule 26 disclosure requirements. (Docket No. 37.) At the time this motion was filed, Nemir's counsel knew that the disclosures described in Fed. R. Civ. P. 26(a) were not applicable to this action because Judge Feikens had so advised counsel at the case management conference held on June 26, 1997, immediately following the hearing on Defendants' motion to transfer venue. *See* L.R. 26.3, providing that the United States District Court for

20

the Eastern District of Michigan had opted out of the initial disclosure requirement of Rule 26(a).  (DX C, John Aff. at ¶¶ 64, 9, 13, and 14.)

On June 9, 1998, Mitsubishi filed an Emergency Motion for a protective order seeking to preclude Nemir from taking certain *de bene esse* fact witness depositions.  (Docket No. 35.)

On June 17, 1998, Nemir filed a motion to compel Defendants to produce Rule 30(b)(6) witnesses and for Rule 37 sanctions for Defendants' failure to do so.  (Docket No. 48.)

On June 26, 1998, Mitsubishi's counsel sent a letter to Nemir's counsel regarding pending discovery disputes and <u>addressed Nemir's theory of "false latching" of the seat belt buckle due to "chipping" and the seat belt buckle "chipping" recall issue as it related to the OSI (other claims) information Nemir sought</u>, told Nemir's counsel that the evidence available from a recent inspection of the vehicle showed no indication of press button "chipping," and asked if counsel had any information to support his theory of "false latching" due to "chipping" of the buckle press button.  (DX C, John Aff. at ¶ 66 (emphasis added).)

On June 30, 1998, the Court held a hearing on:  (1) Mitsubishi's motion to compel supplemental responses from Nemir; (2) Mitsubishi's motion for protective order regarding Nemir's notice of fact witness *de bene esse* depositions; (3) Nemir's motion to compel Rule 30(b)(6) witness depositions and for Rule 37 sanctions; and (4) Nemir's motion to compel adequate and sufficient Rule 26(a) disclosures and for Rule 37 sanctions for Defendant's failure to comply with Rule 26 disclosure requirements.

As to Mitsubishi's motion to compel, the Court found Nemir's discovery responses to be deficient, that this was "troublesome" considering that the case was filed in 1996 and

21

discovery had been extended a number of times, noted that Nemir had not come to the Court with complaints that Mitsubishi's discovery requests were too broad or requested documents solely in Defendant Chrysler's possession, and warned Nemir that his failure to supplement his responses to Mitsubishi's first set of interrogatories and document requests could result in an order prohibiting him from presenting evidence on these matters. (DX AA, 6/30/98 Tr. at 4, 6, 14.) In response to the Court's request, Nemir stated four theories as to the cause of his injuries from his accident: (1) the seat belt unbuckled due to the release of the buckle, and this led Nemir to go forward, causing extreme flexion into the trachea area; (2) there was sufficient impact in the right front fender to initiate the sensor to deploy the air bag but it did not deploy; (3) the construction of the side of the Stealth was such that it was not properly welded, causing immediate transfer of energy that would not ordinarily have happened, thus causing increased, enhanced forces upon the driver; and (4) their failure to warn that the ABS brakes, if pumped, recycle the system and take you out of control. (*Id.* at 14-15.) The Court observed that Nemir's counsel had not adequately responded to Mitsubishi's interrogatories asking about these theories, and required him to file supplemental responses by July 16, 1998. (*Id.* at 19, 36.)

In response to Nemir's counsel's complaints that Mitsubishi also had deficient discovery responses, the Court ordered Nemir's counsel to file an emergency motion to compel by July 7, 1998, so that it could properly address the issue. (*Id.* at 27-28, 36.)

The Court also denied Nemir's motion to compel Rule 26(a) disclosures and for sanctions because, as it had previously informed Nemir's counsel, the Court did not require Rule 26(a) disclosures. (DX AA, 6/30/98 Tr.) The Court then took Mitsubishi's motion for protective order regarding Nemir's notice of fact witness *de bene esse* depositions and

Nemir's motion to compel Rule 30(b)(6) witness depositions and for Rule 37 sanctions under advisement until a continued hearing scheduled for July 16, 1998. (*see id.;* 7/1/98 Hearing Notice, Docket No. 52.)

On July 7, 1998, Nemir filed an emergency motion to compel Defendants to respond to outstanding discovery requests and/or to enter sanctions under Rule 37 and 28 U.S.C. § 1927. Nemir's motion argued that Mitsubishi's discovery responses failed to comply with Rule 26(a)'s disclosure requirements (despite the Court's repeated reminder that it does not follow Rule 26(a)'s disclosure requirements); that it raised bogus objections and excuses for failing to produce highly relevant, material documents; that it speciously argued irrelevance and asserted that Nemir had not alleged sufficient facts to support his theories of recovery for alleged defects; and that it was absurd for Mitsubishi to claim that it could not provide proper discovery responses until Nemir filed proper answers to its pending discovery requests. (Docket No. 54, Nemir Emergency Motion at 2.) As to Mitsubishi's response to Nemir's Document Request No. 26, Nemir argued:

> As in most product liability cases, discovery is not limited to the subject incident facts and circumstances. At a minimum, Defendants should produce documents (regarding other similar incidents) for their understanding of the accident. Finally, the appropriate protective order has been signed; therefore, there should be no delay in forwarding the requested materials.

(Docket No. 54, Nemir emergency motion to compel at 9 (emphasis added).)

As to the response to Request No. 15, Nemir argued (in a broad complaint about responses to Request Nos. 7-10, 12, 13-20) that: "The requests do not need further interpretation. Furthermore, as in most product liability cases, discovery is not limited to the subject incident's facts and circumstances. Finally, the appropriate protective order has

23

been signed; therefore, there should be no delay in forwarding the requested materials." (*Id.* at 9.)

Nemir's motion did not complain about the adequacy of Mitsubishi's response to his Second Document Request Nos. 76 and 77. (*Id.* at 13.)

Mitsubishi responded to Nemir's motion, denied that it was "stonewalling" discovery as Nemir alleged; argued that it was Nemir who had failed to supplement responses to existing interrogatories and document requests concerning his defect theories and the factual basis for each of those defect claims; that, to adequately respond to Nemir's discovery requests, it was necessary for Nemir to first identify and narrow his defect claims; and Nemir's counsel apparently recognized this when he agreed at a December 22, 1997 discovery meeting to supplement his responses to Mitsubishi's discovery requests before requiring Mitsubishi to supplement its responses. (DX BB.)

On July 13, 1998, Mitsubishi filed an emergency motion for protective order seeking to relieve it from the obligation to respond to certain Rule 30(b)(6) depositions noticed for July 14 and 15, 1998, and observing that, at the June 30, 1998 hearing, the Court provided that Mitsubishi's obligation to respond to Nemir's Rule 30(b)(6) deposition notices did not arise until after Nemir submitted his supplemental interrogatory responses (citing 6/30/98 Tr. at 36). (Docket No. 55, Mitsubishi emergency motion at p. 2-3.)

On July 14, 1998, Nemir served his supplemental answers to Interrogatory Nos. 24-31, 33, and 43 of Mitsubishi's first set of interrogatories on Mitsubishi's counsel. (DX CC.) With regard to interrogatories regarding Nemir's defect claims, Nemir responded as follows:

Interrogatory No. 25:

24

State in specific detail the facts which form the basis of the allegations in paragraphs 24, 34, 42, 46, 47, 52, 62, 66, 67, 71 and 79 of the Complaint. Identify all documents related to these allegations.

Supplemental Response No. 25:
Plaintiff would object to the broad sweeping and ambiguous nature of defendants interrogatory.  Defendant having not sufficiently described what they mean by "factual basis."

Moreover, Plaintiff has answered this interrogatory in great detail previously on June 1, 1998 and only submits this affirmation of that fact because the defendants' counsel requested that the Court Order that stated Interrogatory had not been responded to previously when it had.  See; Supplemental Response dated June 1, 1998.

Interrogatory No. 26:
If you allege that the seat belt allegedly worn by plaintiff failed to do the job for which it was intended, describe specifically how such failure allegedly occurred, including but not limited to whether you contend that the buckle or latching mechanism disengaged, the webbing comprising the belt ripped or tore, the belt webbing was somehow defective in any manner, the retractor did not lock, and/or whether the seat belt system became detached from any point where it is normally attached to the vehicle body.

Supplemental Response No. 26:
The separation took place at the buckle, so from an inspection standpoint there is no ripping or tearing of the belt webbing, nor is there a showing of dislodgment or displacement of the anchor bolts and assembly.  The seat belt remained attached to the vehicle body. Mitsubishi/Chrysler/Takata presumably attempted to design a belt which would remain latched at the buckle should an accident take place.  They did not succeed, in that the subject belt unlatched in this particular accident, and a known design flaw exists which allows such inadvertent unlatching to occur.

Interrogatory No. 27:
If you allege that the airbags in the subject vehicle failed to do the job for which they were intended, describe specifically how such failure occurred, including but not limited to whether you contend that the airbag should have, but failed to deploy, during the accident.

Supplemental Response No. 27:
Plaintiff respectfully objects to this Interrogatory in that the defendants have not seen fit to respond to properly proffered Interrogatories and Request to Produce

involving the airbags.  Such responses are necessary to Plaintiff's full and complete response.  The airbag in this case is an airbag whose specifications, manufacturing process, and design are within the knowledge and possession of the defendant and not the plaintiff.  Plaintiff's present understanding of the airbag issue is therefore compromised.

However, without waiving said objection, on information and belief, there is a sufficient factual basis predicated on the inspection of the vehicle.  It appears that the delta v impact that was sufficient for the adjacent censor to have completed the circuit and fired the airbag.  Yet, the airbag did not deploy as it appears to have been designed to do.  Without the defendant's design criteria Failure Mode Effect Analysis and testing, Plaintiff is left to his own devices to ascertain whether or not the airbag should have been designed to deploy in an accident of this nature.  Assuming arguendo, that it was not, on information and belief, had the aribag been designed to deploy in this type of accident, and properly performed that function, Plaintiff's injuries would have been lessened.  Defendant's were aware, or should have been aware of this, and despite that knowledge, failed to design a system within the state of the art at the time which would have offered reasonable protection to the occupant.

Interrogatory No. 28:  [Re: Design Defects]
State whether you claim that the subject vehicle or any of its component parts were defectively designed and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been designed differently.

Supplemental Response No. 28:
Plaintiff responds as follows:

**Seatbelt**
The design defect in this seatbelt buckle is that it allows partial latch and inadvertent unlatching to occur.  Predicated on the knowledge, experience, and inspection of this subject seatbelt buckle and latch plate it has been determined by Plaintiff's expert Thomas Horton, that the probability of partial latch within engineering certainty occurred and allowed the occupant, in this case Dr. Nemir, who is seemingly restrained to become unrestrained in the early moments of the collision.  Dr. Nemir's position is bolstered by his own testimony that he was wearing his belt at the time of the accident and did so habitually (always).  Further, scuff marks on the belt buckle clearly indicate frequent use and the anticipated testimony of Dr. Nemir's friends and family members will support, without exception, his contention that he habitually wore his seat belt.  For a particular example, see the deposition testimony of his daughter, Mary Lou

26

Nemir, who clearly indicated that he always wore his seatbelt. Despite all of this, Dr. Nemir was found post-accident with a disengaged belt.

## Airbag

The airbag censor is located almost directly at the initial impact area on the front right fender. The airbag did not deploy, although it is believed that there was sufficient delta v impact in that area to initiate the censor closing the circuit and firing the inflator. Defendant had steadfastly refused to permit discovery to go forth as to the design, testing, and manufacturing process of what appears to be a Takata system. Either a manufacturing or design defect may be to blame in this area, but without the sought discovery from defendant a final determination as to the nature of this claim, or its very viability, cannot be made. For a further explanation of Plaintiff's design defect claim see supplemental responses to Interrogatories #25 and #27, and NHTSA Irodi, 1D93057O ODI ID-1458 ODI ID-941671 of non-deployment of Mitsubishi airbags.

## Side Components

Plaintiff has indicated that the following side components were defectively designed and/or constructed; the rocker panel, the door, the B-pillar, the floor pan, the rear right quarter, and all of the welds at the base of these components which appear to have "zippered" in the subject collision. The failure of the vehicle to maintain reasonable stiffness rendered it uncrashworthy in that the componentry's failure resulted in a rapid intrusion into the passenger envelope and an unreasonably massive transfer of energy of force effecting the kinematics of the occupant.

Generally, the vehicle and the above componentry should have been <u>designed</u> in a manner which did not present an unreasonable risk of harm to the Plaintiff. The <u>seat belt should have been designed so as not allow the occupant to be released to his peril during collision.</u> The airbag should have been designed to deploy and provide supplemental restraint for the occupant in collisions such as that at bay. The side of the vehicle should have been designed with a reasonable degree of structural integrity so as to absorb a reasonable degree of energy before intrusion into the occupant compartment, and should not have intruded as far as it did.

<u>Interrogatory No. 29</u>:  **[Re Manufacturing Defects]**
State whether you claim that the subject vehicle or any of its component parts were defectively manufactured and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been manufactured differently.

27

Supplemental Response No. 29:
Plaintiff would object to this Interrogatory as posited in that it is overly broad. Plaintiff need merely show under strict liability in tort that the vehicle was defective and that the vehicle was an proximate cause of enhanced injuries to the Plaintiff.  The Plaintiff is not a manufacturer, designer, tester, or seller of automobiles but merely a pediatrician.  The defendant has deliberately precluded the plaintiff from securing discovery in those critical areas of plaintiff's Complaint. Specifically the allegations of defect and failure to warn.  Having said the aforementioned plaintiff will attempt to answer.

The seatbelt system's failure could be attributed to a manufacturing as well as design defect.  See; Supplemental Response #28.  The airbag system's failure could be attributed to a manufacturing as well as design defect.  See; Supplemental Responses #27 and #28. . . .  Simply, all of these components failed to protect the Plaintiff as is reasonably expected.  Without an explanation or information from the defendants as to whether these items failed in this manner by operating as they are designed to operate, or by failing to operate as they were designed to operate, this interrogatory cannot be answered any more specifically, than to say that, on information and belief, the testimony of Plaintiff's experts will support the allegations of his complaint.

Interrogatory No. 30:  **[Re Defective Testing]**
State whether you claim that the subject vehicle or any of its component parts were defectively tested and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been tested differently.

Supplemental Response No. 30:
Plaintiff respectfully objects to this Interrogatory as being improper under strict liability in tort as promulgated in Maryland.  There is no requirement that the plaintiff put himself into the shoes of the manufacturer, but in the spirit of cooperation plaintiff will refer the defendant to his answers to Interrogatory Nos. 24-29 and say additionally that the circumstances surrounding this accident show graphically that this vehicle failed in several respects.  The failure of the latch mechanism in the seatbelt, the failure of the airbag to deploy, and the failure of the side components, and the failure of the side components to withstand a reasonably foreseeable side impact. . . .  Defendant assumes that if the body panels would have hung together the airbag would have deployed and the seatbelt would have kept Dr. Nemir in his seat that the enhanced injuries would not have occurred.  "Performance of the subject vehicle" is ambiguous, really has no meaning to plaintiff in the present posture.  Plaintiff, nevertheless, has attempted to answer the Interrogatory even with its defects.

But, no further response is possible at this time due to defendant's repeated failure to produce the properly noticed 30(b)(6) witnesses in these areas.[7]  In order to ascertain whether testing is proper one would reasonably have to know what testing was or was not done and how it was performed.  These matters are one very important subject of the 30(b)(6) depositions which have been noticed on numerous occasions since March and still have not gone forward. . . .

(DX CC (emphasis added).)

On July 16, 1998, Nemir submitted Supplemental Interrogatory Answers to Mitsubishi's Interrogatories No. 37 and 45.  Response No. 37 provides detail regarding Nemir's experts.  Interrogatory No. 45 asks whether plaintiff, or anyone acting on his behalf, has visited the scene of the accident since the accident; and if so, requests the identify of such persons, the dates of the visit; and whether measurements, films, videotapes, or photographs were taken, where reports were made, and whether any attempt to reconstruct any part of the accident was made.  Nemir's Response No. 45 refers back to his Supplemental Responses to Interrogatory Nos. 37 and 21.  (DX U.)

On July 16, 1998, a hearing was held on pending discovery motions.  After stating that it was postponing the August 1998 trial date, the Court then considered Mitsubishi's motion to compel supplemental discovery responses from Nemir.  It observed that at the June 30, 1998 hearing, Nemir's counsel had identified four defect claims; i.e., seat belt, air bag, side structure of the vehicle, and a failure to warn on the ABS brakes.  It found Nemir's supplemental responses regarding his defect claims were still deficient; i.e., answers to Interrogatory Nos. 21, 26-32, 37, and 45 and Document Request Nos. 4 and 19.  Finding Nemir's answers unresponsive, the Court ordered Nemir to once again supplement his

---

[7]At this point in time, Plaintiff's counsel knew that these Rule 30(b)(6) motions were the subject of a pending motion for protective order that the Court had taken under advisement and had scheduled a continued hearing on July 16, 1998.

discovery responses by July 31, 1998. The Court also determined that it would not require Mitsubishi to produce any Rule 30(b)(6) witnesses until after Nemir supplemented his discovery responses on July 31, 1998, and Mitsubishi had the opportunity to inform the Court whether or not the supplemental responses as to Nemir's defect theories were satisfactory. If Nemir had satisfactorily supplemented his discovery responses, then the Court would order Mitsubishi to produce the appropriate Rule 30(b)(6) witnesses to address the identified defect theories. The Court set August 11, 1998 as the date for the continued hearing on all pending discovery motions. (DX DD, 7/16/98 Tr. at 13-15.) The Court explained that the reason it was proceeding in this manner was to assure that the appropriate Rule 30(b)(6) witnesses were produced as to each of Nemir's defect claims. (*Id.* at 15.) The Court also stated that it would adjourn the August 11, 1998 trial date to a date to be set at the August 11, 1998 motion hearing. (*Id.* at 18.)

On July 31, 1998, Nemir submitted additional supplemental responses as ordered by the Court. (DX FF.) Although Nemir submitted supplemental responses as to his alleged seat belt, air bag and side component defect claims, the following focus solely on his seat belt claims:

Interrogatory No. 25:
State in specific detail the facts which form the basis of the allegations in paragraphs 24, 34, 42, 46, 47, 52, 62, 66, 67, 71 and 79 of the Complaint. Identify all documents related to these allegations.

Supplemental Response No. 25:
Plaintiff would object to the broad sweeping and ambiguous nature of defendants interrogatories. Defendant having not sufficiently described what they mean by "factual basis."

30

Plaintiff has answered this interrogatory in great detail previously on June 1, 1998 and only submits this affirmation because the defendants counsel requested the Court Order that stated that said Interrogatory had not been responded to.

Interrogatory No. 26:
If you allege that the seat belt allegedly worn by plaintiff failed to do the job for which it was intended, describe specifically how such failure allegedly occurred, including but not limited to whether you contend that the buckle or latching mechanism disengaged, the webbing comprising the belt ripped or tore, the belt webbing was somehow defective in any manner, the retractor did not lock, and/or whether the seat belt system became detached from any point where it is normally attached to the vehicle body.

Supplemental Response No. 26:
Plaintiff would specifically object to the interrogatory as posited in that the Defendant who possesses all of the data, prints, drawings, testing and other meaningful data has refused to provide them to the Plaintiff.  As stated the, Takata series 523, used in this had a seat belt buckle and latch plate which exhibited evidence of a partial latch condition, whereby the latch plate appears to be fully latched, and in fact is only partially latched and releases the buckle under relatively light contact by the occupant in the collision.  It is believed that the molybelemite coated pad is one of the culprits.  In order to specifically identify the nomenclature of the subcomponents within the system which was designed by Takata, Plaintiff's expert must have the requested documents that were available at the time the vehicle was designed on [sic] manufactured.

At the first Pretrial the Court invited Plaintiff's counsel to dismiss Takata from the lawsuit on the basis that Mitsubishi would assume the Defendant Takata and subsidiaries defense; therefore, it is proper to assume that the Defendant Mitsubishi has all the necessary materials in their possession and can answer and provide Plaintiff with same.

The unlatching of the tongue of the system from the buckle took place at the point at which Dr. Nemir contacted the belt buckle mechanism.  Mr. Horton advises that it is not necessary to have load marks in such a separation and it would be more than likely that there would not be load marks.

The belt did not rip or tear, there was nothing wrong with the webbing, the retractor was not engaged and the seat belt system did not become detached from any point on the vehicle body.

In that the Defendant has steadfastly refused to respond to Plaintiffs [sic] Request to Produce Interrogatories, Plaintiff's biomechanical experts as well as his technical experts are at a distinct prejudiced position.  The separation took

place at the buckle so from the experts' standpoint there was no ripping or tearing of the belt webbing, or was there a showing of dislodgement or displacement of the anchor bolts and assembly. The seat belt remained attached to the vehicle body. Mitsubishi, Chrysler and Takata the supplier attempted to design a belt that would remain latched at the buckle should an accident take place; thus, Plaintiff does not allege that the webbing comprising belt rip or tore [sic]. The belt webbing was not defective. Obviously the retractor did not lock and as far as the physical observation the seat belt system did not come detached from any point other than between the buckle and the latching mechanism. The corporate Defendants did not succeed in their design and most probably in the manufacture of their subject seat belt system because it unlatched in a reasonably anticipated impact automobile accident and the known design flaw manifested itself and exhibits and is commiserate with complaints filed with the NHTSA.

* * *

Interrogatory No. 28:  **[Re: Design Defects]**
State whether you claim that the subject vehicle or any of its component parts were defectively designed and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been designed differently.

Supplemental Response No. 28:
Plaintiff would respectfully object to this interrogatory that there is absolutely no requirement under Maryland Strict Liability in Tort or in the Federal Rules that Plaintiff must make out a prima facie case by redesigning the vehicle or the defective component with or without data which is in the exclusive control of the Defendant. Plaintiff would also object to the ambiguous terminology "which the alleged affected any aspect of the performance of the subject vehicle" which is patently unclear, the Plaintiff does not understand whether or not the Defendant wants to know if he kept the vehicle from going off the road, if the wheels stopped, if the steering wheel hung up, if the brakes let go which is a list of possible things that could affect the performance of the vehicle. If the Defendant means by the performance of the vehicle, the vehicle's ability to withstand the reasonably anticipated impact on the right side the Plaintiff could state; albeit, and without engineering certainty which is predicated upon the engineer having all available data in front of him including of all manufacturers data which is in the exclusive control of Defendant coupled with the factual basis necessary for him to be where he could opine within engineering certainty FRE 702. (Plaintiff has outlined in detail in his multiple supplemental interrogatory answers that from all outward appearances and visualizing the airbag, that it did not deploy, the seat belt buckle became unlatched, the body components enumerated the B-pillar,

32

the rocker panel, side door, floor pan, and the rear quarter panel failed because of faulty welds.)  Plaintiff would suggest that the <u>design</u> of these components should be at a bare minimum and should have equaled or exceeded their General Motors/Ford/Chrysler FMEA (1985-1993) and their Design Failure Mode Analysis which is also enumerated in ISO 9000.

<u>Seat Belt Assembly</u>
The <u>design defect in this seatbelt buckle is that it allows partial latch to occur.</u> Predicated on the knowledge, experience, and inspection of this subject seatbelt buckle, pad, spring and latch plate it has been determined that there was a high probability of partial latch within engineering certainty occurred which allowed the occupant, in this case Dr. Nemir, who is seemingly restrained to become unrestrained in the early moments of the collision.  Dr. Nemir's position as to his seat belt usage is bolstered by his own testimony and the testimony of his daughter, Mary Lou Nemir, who indicated that he always wore his seatbelt as well as definite seat belt usage patterns.  Plaintiff will call upon Plaintiff's expert to opine as to <u>design and causal relationship</u> when and if this Defendant ever turns over the requested documents which Plaintiff agreed to have protected in the Court's Order to have them promulgated in accordance with that Joint Protective Order issued by this Court.

\* \* \*

<u>Interrogatory No. 29</u>:  **[Re Manufacturing Defects]**
State whether you claim that the subject vehicle or any of its component parts were defectively manufactured and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been manufactured differently.

<u>Supplemental Response No. 29</u>:
Plaintiff would object to this interrogatory in that it is overly broad.  Plaintiff need merely show under Strict Liability in Tort that the vehicle was a proximate cause of enhanced injuries to the Plaintiff.  The Plaintiff is not a manufacturer, designer, tester, or seller of automobiles but merely a pediatrician.  The Defendant has deliberately precluded the Plaintiff from securing discovery in those critical areas of Plaintiff's Complaint.  Specifically the allegations of defect and failure to warn. Having said the aforementioned Plaintiff will attempt to answer.

<u>Seat Belt System</u>

33

The seat belt system's failure <u>could be attributed to both manufacturing as well as design defect</u>.  See Supplemental Response #28.

* * *

<u>Interrogatory No. 30</u>:  **[Re Defective Testing]**
State whether you claim that the subject vehicle or any of its component parts were defectively tested and, if so, describe the basis for such contention, including a precise description of each alleged defect, the evidence on which this contention is based, the manner in which the alleged defect affected any aspect of the performance of the subject vehicle, and in what manner you contend the subject vehicle or any component thereof should have been tested differently.

<u>Supplemental Response No. 30</u>:
Plaintiff contends and has contended to see answers 24-29 that component parts have been defectively tested requires that Plaintiff be equally cognizant of the tests that this Defendant ran on the Mitsubishi Stealth in the prototype stage or while the vehicle was in production, this is not the case or would it ever be. Plaintiff further objects to interrogatories being improper under Strict Liability in Tort as promulgated in the State of Maryland or any other substantive law governing Strict Liability throughout the United States.  There is no requirement that Plaintiff put himself into the shoes of the manufacturer, but in the spirit of cooperation the Plaintiff will refer the Defendants to his answers to interrogatories #24-29 and say additionally that the circumstances surrounding this accident show graphically that this vehicle failed in several respects. <u>Failure of the latch mechanism of the seat belt</u> and failure of the airbag to deploy and the failure of the side components and the failure side components [sic] to withstand a reasonable foreseeable side impact are indicators of poor testing. . . .  <u>Both the seat belt and the airbag would have served as restraints to keep Dr. Nemir out of the position of harm and would have retarded his body kinetics.</u> . . . No further response is possible at this time due to the Defendants' repeated failure to produce the properly noticed 30(b)(6) witnesses in these areas in order to ascertain whether testing is a proper one.  One reasonably has to know what testing was done or not done and how it was performed. . . . and no opinion within engineering certainty in this complex products liability case can be posited without the 30(b)(6) depositions which have been noticed on numerous occasions since March and still has not gone forward. . . .[8]

(DX FF (emphasis added).)

_____

[8]At this time, Plaintiff knew that the Court had instructed Defendants to hold off on producing Rule 30(b)(6) deponents until after Plaintiff supplemented his discovery responses so that when the deponents produced would be those most able to respond to Plaintiff's more detailed and focused defect claims.

On August 18, 1998, the Court held a hearing on all pending discovery matters. It first addressed its prior grant of Mitsubishi's motion to compel. Mitsubishi's counsel complained that Nemir's seat belt defect theory -- that Nemir was latched and then unlatched -- was inadequate and did not inform Mitsubishi as to what component parts Nemir was alleging were defective. The Court acknowledged that Nemir's defect claims covered both design and manufacturing defects and even hinted at defective inspection and assembly. Nonetheless, the Court found that, pursuant to its June 30 and July 16, 1998 orders, Nemir had supplemented his responses to Mitsubishi's discovery requests all that he could at this point and the Court would not require further supplementation. (DX HH, 8/11/98 Tr. at 12, 16-19; PX 8, Scheduling Order and Order Regarding Discovery filed 9/17/98.)

The Court granted Nemir's motion to compel Mitsubishi to produce two Rule 30(b)(6) witnesses requested by Nemir and a third "designated by defendant Mitsubishi Motors Corporation concerning the design and testing of the drivers side seat belt buckle in the subject vehicle." (PX 8, 9/17/98 Order at 3.) It also granted Nemir's motion to compel Mitsubishi to respond to Nemir's discovery requests and ordered Mitsubishi to "utilize its best efforts to supplement its responses" to interrogatories and document requests, including Document Requests Nos. 15 and 26. (PX 8, 9/17/98 Order at 2.)

The Court did not rule on Nemir's request, made in connection with each motion to compel, for sanctions against Mitsubishi. (DX HH, 8/11/98 Tr. at 35.)

On September 11, 1998, Mitsubishi served Nemir with its First Supplemental Responses to Plaintiff's first request to produce. Its supplemental responses to Requests No. 15 and 26 are as follows:

Request No. 15:

35

All documents relating to or consisting of studies, literature, surveys, tests, analysis, research or investigation of any nature conducted by you or anyone else regarding the seatbelt system used in the subject vehicle, both front and rear.

Supplemental Response No. 15:
Subject to and without waiving or limiting its objections served October 31, 1997, see MMC's responses to Request Nos. 1 through 6 and 8 through 10, as supplemented.  By way of further response, MMC currently is unaware of any further materials responsive to this request.

* * *

Request No. 26
All documents containing, referring to, or relating to any claims, assertion, or report by any individual or entity that any Dodge vehicle using the same or similar seatbelt system wherein a front seat belted passenger received a serious or fatal injuries [sic].

Supplemental Response No. 26:
Subject to and without waiving or limiting its objections served October 31, 1997, MMC currently is unaware of any materials responsive to this request.

(DX II at 6, 8.)

Mitsubishi's counsel avers that Mitsubishi did its best to make sense out of Nemir's poorly-worded discovery requests and poorly-articulated claims.  With respect to Request No. 15, Mitsubishi had produced FMVSS 208 compliance testing, FMVSS 208 testing videotape report, seat belt installation drawings, seat belt assembly drawings and seat belt specifications applicable to the front safety belt assemblies in the 1991 Dodge Stealth. With respect to Request No. 26, Mitsubishi searched for and did not locate claims made before the date of this accident that a front belted passenger received serious or fatal injuries in a substantially similar "Dodge" vehicle using the same or similar seat belt involving facts and circumstances similar to the accident and claims in the _Nemir_ case. Mitsubishi's counsel avers that, as to Request No. 26, Mitsubishi searched using the

36

parameters that Nemir set out in Request No. 26 "coupled with those Plaintiff had suggested (and MMC had used all along with Plaintiff's knowledge) in his Emergency Motion filed in July, 1998."[9]   (DX C, John Aff. at ¶ 77 (emphasis added).)   Mitsubishi's counsel further avers that Mitsubishi does not routinely maintain claims in its regular course of business on Dodge vehicles.   (*Id.*)

On November 5, 1998, Bowman and Brooke LLP filed its appearance and became lead counsel in this action.   (*Id.* at ¶ 78; DX JJ, Appearance.)

On November 17, 1998, the Court held a hearing in response to Nemir's counsel's letter to Judge Feikens complaining that Mitsubishi had failed to produce a proper Rule 30(b)(6) witness to testify on its behalf regarding the design and testing of the driver's side seat belt buckle in the subject vehicle pursuant to the Court's September 17, 1998 order. (PX 11, 9/17/98 Tr. at 3.)   Mitsubishi argued that Mr. Nakahama was an appropriate witness to testify on the subject of design and testing of the seat belt in question because he had a master's degree in engineering and had worked at Mitsubishi for 20 years, primarily on testing of vehicles like Nemir's Dodge Stealth.   Although he did not personally design the buckle -- it was purchased from a supplier called Takata -- the buckle was designed by Takata to meet Mitsubishi's specifications and then Mitsubishi tested the

---

[9]In his July 1998 emergency motion to compel, Nemir's counsel complained that Mitsubishi's response to his first set of document requests, Request No. 26, was inadequate, arguing:

> As in most product liability cases, discovery is not limited to the subject incident facts and circumstances. At a minimum, Defendants should produce documents (regarding other similar incidents) for their understanding of the accident. . . .

(Docket No. 54, Nemir emergency motion to compel at 9 (emphasis added).)

buckle. (*Id.* at 5.)  Mr. Nakahama brought to the deposition all design drawings and testing of the seat belt system.   Before the deposition, he spoke directly with all Mitsubishi engineers who worked with this particular seat belt design, inquired about a recall involving this buckle and its details, and was prepared to and did answer questions about it.  He also discussed all tests run by other engineers on the belt and was prepared to and discuss the tests.  He searched for all design and testing documents, reviewed them and videotapes of all testing, but was only asked about one part of one test report.   Nemir's counsel complained that this was inadequate.

Nemir's counsel also complained that Mitsubishi had "[i]nformation regarding consumer complaints, for instance, regarding the NHTSA investigation, regarding the relationship with Takata, relating -- resulting in the inclusion of this buckle, regarding the FMVSS 209 testing, which the Plaintiffs will allege in this case was not – "  (*Id.* at 17.)  The Court responded that this latest complaint was outside the purview of the Court's September 17, 1998 order regarding Rule 30(b)(6) witnesses:  "That was not within the request that was made for discovery that led to my order of September 17th.  You didn't ask for that information."  (*Id.* at 17.)   Nemir's counsel disagreed, stating that the information was requested in Document Request No. 26, which involved consumer complaints, and Mitsubishi had not produced the documents.  (*Id.* at 18.)  When asked by the Court, Mitsubishi's counsel Craig John responded:

> With respect to all of the requests that are contained in the order, we produced what documents exist and what documents were able to be located.
>
> With respect to document request number 26, I cannot immediately recall what that one was, but I know we specifically went through, pursuant to the Court's order, and pursuant to the Court's direction, that we locate documents responsive to those items that were listed in the order, and if we found

38

documents, we produced them.  If there were no documents, we indicated there
were no documents.

* * *

We found no documents responsive to this request based on the seat belt buckle
involved in this case, <u>and the claims involved -- the nature of the claims involved
in this case.  In other words, partial latching or unlatching or anything of that
nature.</u>

(*Id.* at 19-20 (emphasis added).)

When asked by the Court what makes him believe that there is in existence the
information that he asked for in Request No. 26, Nemir's counsel responded:  (1) the
Takata 52 buckle was recalled and recalls only come from NHTSA if it receives consumer
complaints; and (2) Mr. Nakahama, when asked about these issues, testified that Dodge
and Mitsubishi dealers compile this type of consumer complaint information, that he's seen
it, but he could not comment about it as to this particular vehicle.  (*Id.* at 21-22.)
Mitsubishi's counsel responded that Takata sold the seat belt buckle involved in the recall
to lots of manufacturers and that it was installed on the vehicle involved in Nemir's accident,
but argued that that does not mean that Mitsubishi had documents that were responsive
to Request No. 26.  (*Id.* at 22.)  Mitsubishi's counsel further responded that:

There is evidence of the recall, but whether or not there are any claims that are
specific to request number 26 and our response to request number 26, we've
looked and haven't found them.  So that's what there is.  The mere fact that there
was a recall doesn't mean that there were claims of the type requested in
request number 26.

(*Id.* at 23.)

In response to the Court's query whether there were customer complaints as to this
particular seat belt buckle, Mitsubishi's counsel responded, "Not that we have found, your
Honor.... "  (*Id.*)

39

In response to the Court's inquiry to him, Nemir's counsel clarified that Mr. Nakahama's testimony was that Mitsubishi collects information from accidents and that they study consumer complaints, but "he didn't say that there were any that he knew of about this buckle in the manner they have described these complaints that they think exist. So he did not so testify that they had compilations of that information." (*Id.* at 23-24.)

When asked to respond to the Court as an officer of the Court, Mitsubishi's counsel, Craig John, responded that he had made a due diligence type search and found no evidence in Mitsubishi's files that were responsive to Request No. 26:

> That -- that is absolutely true. With respect to the requests contained in request number 26, my client, which it has been doing this at my direction for 10 years, and no documents, I will tell you as an officer of this court; responsive to that request were located.
>
> * * *
>
> . . . . If my client finds the information, it will be produced. There is no information that has been found to this day. If someone trips over it and locates it in a place that nobody looked before, it will be produced. If it surfaces somewhere else, then I'm going to want to know how it got there, where it came from, just as much as the Court will.
>
> * * *
>
> I would just add, your Honor, that with this client, I have advised them that we need to continue looking, even in places that we haven't looked before, if -- if we have to do so. And if we come across something that's responsive that we haven't before produced, we have to produce it and we have to be prepared to explain why it wasn't produced before. And we will take care of it this time, and if it happens again, we'll take care of it then. I don't expect that it will, though.

(*Id.* at 24-25, 30-31.) The Court cautioned Mitsubishi's counsel that "Rule 37, and the sanctions that are implicit in that rule, would make it difficult for you to introduce counteracting evidence to what the Plaintiff presented if those particular documents were not furnished or came in at -- at an unduly late time." (*Id.* at 31.)

Finally, at the November 17, 1998 hearing, the Court rejected Nemir's counsel's requests to extend discovery yet again, stating "I entered an order.  That order has to be obeyed.  If the Defendants did not obey it, they disobeyed it at their peril.  But I'm not going to now reopen this September 17th order to require again another blizzard of ...requests. . . .  I'm not going to permit any re-notice of any depositions.    (*Id.* at 27-28.)  The Court then set March 16, 1999 for the final pretrial conference and trial for April 6, 1999.

On December 15, 1998, Mitsubishi filed an emergency motion to compel production of the accident vehicle for inspection, a hearing was held on December 29, 1998, where the Court granted Mitsubishi's motion.  (*See* Docket entry for 12/29/98; Docket No. 88, 2/3/99 Order Regarding Subject Vehicle and Its Component Parts.)

On February 3, 1999, the Court entered a Stipulation and Order where Nemir voluntarily dismissed his design and/or manufacturing defect claims as to Nemir's vehicle's (1) body structure, (2) airbag system, (3) anti-lock braking system, (4) stability and handling; and (5) seat back.  (Docket No. 89, 2/3/99 Stipulation and Order Dismissing Certain Claims.)

## C.  Plaintiff's Motion for Sanctions and Court's March 16, 1999 Hearing

**On March 8, 1999**, Nemir filed a motion for sanctions against Defendants for willful refusal to make discovery and for bad faith material misrepresentations to the Court and to Plaintiff.[10]    Nemir's counsel informed the Court that he "undertook an extensive

---

[10]In *Nemir IV*, the Sixth Circuit erroneously identifies the date the district court addressed Plaintiff's sanction motion.  Plaintiff's request for sanctions was discussed at a March 16, 1999 hearing.  There was no hearing held on March 16, 2001.  *See Nemir IV*, 381 F.3d at 546.

investigation of this matter by contacting <u>other interested counsel throughout the country;</u> <u>placing an advertisement in the information exchange section of a notable legal periodical;</u> <u>promulgating a Freedom of Information Act Request to the National Highway</u> <u>Transportation Safety Administration, and; personally traveling to the Department of</u> <u>Transportation in Washington, D.C. to secure copies of relevant documents.  A plethora of</u> <u>supposedly non-existent consumer complaints regarding unlatching of Takata 52 series belt</u> <u>buckles were uncovered by this investigation</u>."   (Docket No. 104, Nemir motion for sanctions at 6-7 (emphasis added).)  Nemir attached a sample of documents, claiming they were within the scope of his Document Request No. 26 because they were <u>"consumer</u> <u>complaints regarding:  (1) Dodge branded automobiles; (2) with the same or similar seat</u> <u>belt system; (3) in which a front seat belted passenger received serious or fatal injury."</u>  (*Id.* at 7 (emphasis added).)

In his motion, Nemir argued that "all these documents are highly relevant to Plaintiff's cause of action, were within the possession, knowledge and control of Chrysler Corporation and/or Mitsubishi and were actually produced by those entities in response to a similar request made by the government.  Defendants not only failed to produce these documents to Plaintiff, they affirmatively represented that no such documents existed.  It is clear that Defendants knew these representations to be untrue when made and yet, even through the present date, they have done absolutely nothing to supplement or correct their false statements."  (*Id.* at 7-8.)

Nemir's motion sought sanctions under Fed. R. Civ. P. 37(b)(2)(C) in the form of a default judgment against Defendants, or alternatively, under Fed. R. Civ. P. 26(g), 28 U.S.C. § 1927, or the Court's inherent powers.

42

**On March 16, 1999**, the Court held a scheduled status conference where, among other matters, it determined that it would stay Nemir's motion for sanctions filed on March 8, 1999 until another time and told Mitsubishi's counsel there was no need to file a response brief until further notice. (DX MM, 3/16/99 Tr. at 5-6, 54.) The Court did note, however, that when the docket sheet was examined, it would "be with some great difficulty that I determine to levy sanctions in this case because I think both sides are probably culpable in that area, but I just don't want to be bothered by sanctions. There's too much in this case right now and I'll simply stay that matter and return to it when the time is appropriate." (*Id.* at 6.)

The Court later inquired about what evidence Nemir had to support his theory; i.e., that the seat belt was defectively designed because, in actual use, it can partially unlatch while giving the appearance that it is latched. Nemir's counsel responded that "their own list of consumer complaints regarding this buckle. . . unlatching in accidents by the Defendants' own representatives – . . . [but] [w]e have not had the opportunity to investigate those fully because of Defendants' misrepresentations as to the existence of these consumer complaints." (*Id.* at 34.)

Mitsubishi's counsel responded that, "[t]he consumer complaints that they got, Your Honor, they got from NHTSA publicly available documents that do not show this partial latch condition and do not have facts similar to that accident at all. . . . What he has said in his motion for sanctions is that we should have produced these documents." (*Id.* at 34-45.)

The Court followed up by asking whether Mitsubishi had the documents Nemir said it should have produced, and Mr. Kelly, on behalf of Mitsubishi responded: "He has them.

43

He's provided them to the Court, and I believe I have information that suggests that he's had these documents and access to them for many months." (*Id.*) Nemir's counsel denied this and denied that he had all the documents he wanted; i.e., "those the manufacturers have chosen not to submit to the public record." (*Id.* at 35-36.)  After Mitsubishi's counsel told the Court that he did not know of any other documents, the Court ordered that:

> Well, I want you to make this investigation.  I want to know whether or not you have any documents, your client has any documents on partial latching complaints that [Nemir's counsel] does not have.

(*Id.* at 37.)  The Court then ordered Nemir's counsel to show Mitsubishi's counsel the two or three hundred consumer complaints regarding the buckle that he claimed he had and then ordered Mitsubishi's counsel "to determine whether or not you have any documents over and above the two or three hundred that he shows you that show whether or not partial latching has occurred in these complaints." (*Id.*)  The Court again ordered Mitsubishi's counsel to go and make the search "either in the documents you've obtained or in the documents you may have . . . that show that partial latching has occurred in the way in which it occurred allegedly in this case. . . .  I'm not asking you to furnish documents that don't say partial latching, I'm asking you to furnish documents that do allege partial latching." (*Id.* at 39-40 (emphasis added).)  When Mitsubishi's counsel inquired whether the Court was ordering it to produce documents related to the recall of the Takata seat belt buckle dealing with the question of a broken piece of plastic in the buckle, the Court replied:

> I'm not talking about that.  I'm not talking about that.  I'm talking about partial latching. . . .  I'm not talking about broken latches. . . .  I'm talking about partial latching, where it's alleged, as the Plaintiff has alleged it here, that in using the seat belt buckle and inserting it, it's possible to have it partially latched, when it's apparent to the user that it seems to be fully latched."

(*Id.* at 41-42 (emphasis added).)  Nemir's counsel then protested:

> The recall documents with NHTSA, they involve numerous complaints of unlatching in accidents. The Defendants, by their own representations both to NHTSA and to this Court, have contended that unlatching is not a possible outcome or a confirmed outcome from the push button phenomena, therefore, it stands to reason that there is some evidence of this partial latch condition in any case where there's been a latching complaint by a consumer. I would appreciate it if the investigation to [Mitsubishi's counsel] is to perform would take into account all of those complaints as well as –

(*Id.* at 42.) The Court simply stated, "[i]f they involve partial latching allegations, yes." (*Id.*)

"You understand what I'm asking you to do? I want you to give them any documents that you have on partial latching claims. . . . for this Takata latch. . . ." (*Id.* at 48.)

The Court gave Mitsubishi's counsel until April 16, 1999 to produce a full version of those documents, not a redacted form. (*Id.* at 38-39, 48.)

Finally, the Court adjourned the scheduled April 5, 1999 trial date and scheduled motions for summary judgment on April 26, 1999. (*Id.* at 46, 50.) The Court did not issue a written order as to this March 16, 1999 hearing.

On April 13, 1999, Mitsubishi (and Chrysler) filed a report summarizing and explaining how they had complied with the Court's directions given at the March 16, 1999 pre-trial conference. (DX NN.)[11]

On April 22, 1999, Plaintiff filed an emergency motion to compel compliance with the March 16, 1999 order of Court and to adjourn the April 27, 1999 hearing date on Defendants' motions for summary judgment. (Docket No. 114.) Plaintiff argued that Mitsubishi failed to comply with the Court's order because, despite its review of 29,000 potentially responsive documents; i.e.: "(a) All its legal claim files regarding seat belt litigation for vehicles equipped with the Takata 52 series belt"; "(b) Its Customer Contact

---

[11] *See infra*, n. 19.

Report computerized database and approximately **4,000** potentially responsive reports contained therein"; and "(c) Approximately **25,000** seat belt warranty claims **potentially involving unlatching** of this belt buckle", Mitsubishi produced zero documents to Plaintiff. (*Id.* at 4 (emphasis in original).)

Plaintiff conceded that he "has never sought and does not now seek production of documents identified in Defendants' category (2); i.e., claims that a seat belt buckle came unlatched, or would not latch properly, for a stated reason other than partial latching. Plaintiff did, however, claim that he had previously requested documents identified by Defendants in category (1) -- claims that the seat belt failed to "hold" or "restrain" a belted occupant -- and category (3) -- claims that a seat belt buckle came unlatched in an unspecified manner, stating no claim of alleged cause or method of unlatching. Accordingly, Plaintiff requested that the Court compel Mitsubishi to produce those documents.  (*Id.* at 8.)

On April 26, 1999, Defendants responded, arguing that they had complied with the Court's March 16, 1999 directive to search for and produce, if found, documents showing claims that partial latching occurred in other incidents in the way alleged to have occurred in this case.  (Docket No. 115.)

On April 27, 1999, the Court issued an Order requiring Defendants to "make available forthwith to plaintiff documents" described in its categories (1) and (3).  It gave Plaintiff until May 18, 1999 to review these documents, and adjourned the hearing on motions for summary judgment until May 21, 1999.  (Docket No. 116, 4/27/99 Order granting Plaintiff's motion to compel and to adjourn.)

46

On April 30, 1999, Defendants filed a motion for clarification and for protective order. (Docket No. 117.)  Defendants sought clarification of the Court's April 27, 1999 Order so as to ensure that their actions properly comply with that order, and where appropriate, entry of a protective order.   Specifically, Defendants explained that four groups of "claim" documents were included in their review:   (1) DaimlerChrysler CAIRs; (2) Mitsubishi warranty claims; (3) Mitsubishi customer contact reports (CCRs); and (4) legal claims.  (*Id.* at 3.)  Defendants read the Court's April 27 Order to relate only to groups (2)-(4).

As to warranty claims, to insure prompt compliance, Defendants stated that it would be necessary to produce the entire group of approximately 25,000 documents to Plaintiff and reported Plaintiff's counsel did not object to this bulk production.  (*Id.*)  As to the CCRs, it would also be necessary to produce the entire set of 4,000 documents and Plaintiff's counsel likewise agreed to this bulk production.  (*Id.* at 4.)  As to legal claims, Defendants stated their concern that it would be impossible to make all legal claim documents falling with categories (1) and (3) by the date ordered.  Defendants also asserted that "accidents or incidents post-dating the plaintiff's injury are of little or no relevance to whether Defendants had 'notice' of the partial engagement phenomenon as plaintiff claims it happened in this accident."  (*Id.* at 4.)  Accordingly, they asked the Court for a protective order (1) limiting production of legal claims "to those incidents reported on or before the date of the subject incident (December 13, 1993), or grant more time for the production"; and (2) "prohibiting Plaintiff's counsel from contacting the MMC and DaimlerChrysler customers whose names appear on the documents produced."  (*Id.* at 4-5.)

47

On May 4, 1999, the Court entered an Order granting in part and denying in part Defendants' motion for clarification and for protective order.  (Docket No. 118, 5/4/99 Order.)  The Court ordered Defendants to produce:  (1) all 25,000 warranty claims documents and 4,000 customer contact reports documents as stated in paragraphs 9 and 10 of Defendants' motion at the earliest possible date; and (2) all "legal claim documents" as ordered on April 27, 1999, "promptly and with reasonable dispatch."  (*Id.*)  It denied Defendants' request to limit production of "legal claim documents" to those claims that pre-date Plaintiff's injuries and denied Defendants request for additional time.  Plaintiff was allowed until May 18, 1999, to review the contents of the documents produced, but was not allowed "to conduct further discovery by attempting to interview or contact complainants listed in these documents."  (*Id.* at 2.)

On May 11, 1999, all documents were produced to Plaintiff.


### D.  Grant of Summary Judgment, Appeal, and Remand

On July 30, 1999, the Court entered an Opinion and Order granting Defendants' motions for summary judgment.  (DX QQ.)  *Nemir v. Mitsubishi Motors Sales of Am., Inc.*, 60 F. Supp.2d 660 (E.D. Mich. 1999) (Feikens, J.)  Plaintiff appealed.

**On March 2, 2001**, the Sixth Circuit affirmed in part, reversed in part, and remanded in part, holding that:  (1) the district court improperly refused to consider any of the testimony of Plaintiff's expert Thomas Horton; (2) when that expert testimony and other proffered evidence is considered, there was a genuine issue of material fact, precluding summary judgment, as to whether a partial latching of the seatbelt caused the injury in question; but (3) the district court properly dismissed Plaintiff's failure to warn and punitive

damages claims.  *Nemir v. Mitsubishi Motor Sales of Am., Inc.*, No. 99-1907, 2001 WL

223775, 6 Fed. Appx. 266 (6th Cir. March 2, 2001) (*per curiam*) (*Nemir I*).

In *Nemir IV*, the Court describes its *Nemir I* holding as follows:

> First, we noted that the district court had erroneously stated that Horton had not examined the actual buckle in Nemir's seatbelt -- an omission that the district court had dubbed "inexplicable" -- when in fact the record revealed that Horton had testified that he had examined the actual buckle and that it had partially latched twice out of twenty attempts. [*Nemir I*, 6 Fed. Appx. 266, 274] Second, we held that the district court erroneously excluded the entirety of Horton's testimony, and specifically held that "Horton could use [the abovementioned testing] to testify that the partial latch of Dr. Nemir's seatbelt caused the damage in question." *Id.* at 275.  Third, we held that Nemir had produced sufficient evidence for a jury to conclude that a design defect rendered the buckle unreasonably dangerous. *Id.* at 277.  We remanded for trial.

*Nemir IV*, 381 F.3d at 545.  With regard to the consumer complaint discovery that is the

subject of the present motion for sanctions, the *Nemir IV* Court explained that in *Nemir I*:

> We also ordered the district court to afford Nemir sufficient time and opportunity to investigate the consumer complaints that Mitsubishi had turned over at "the eleventh hour." [*Nemir I*, 6 Fed. Appx. at 275].  Although Mitsubishi argued that none of the consumer complaints contained the words "partial latch," and thus were not discoverable, we rejoined that "the term 'partial latch phenomenon' is a term of art employed by engineers, seatbelt designers, and lawyers.  The layman with a concern that his seatbelt will not remain fastened will not use this term." *Id.* at 276.  After reviewing the sample of 188 complaints that Nemir had included in the appellate record, we noted that "[a] complete review of the record indicates that phraseology analogous to 'intermittent partial latching' occurred 188 times in the customer complaints submitted as evidence.  To summarily dismiss the evidence without affording the plaintiff time to investigate and further elicit information regarding the exact nature of these incidents is clear error." *Id.*

*Nemir IV*, 381 F.3d at 545.

## E.  Post-Remand after March 2, 2001 *Nemir I* Decision

On March 26, 2001, Defendants filed a motion for a protective order regarding

Plaintiff's expert's testing of the actual seat belt in Plaintiff's 1991 Dodge Stealth and

49

regarding the procedure for conducting customer interviews as required by the Sixth Circuit in *Nemir I.*

On March 30, 2001, the Court held a hearing on Defendants' motion and miscellaneous discovery issues. First, Plaintiff and Defendants agreed that, because Plaintiff's expert Thomas Horton had submitted an Affidavit in connection with summary judgment motions disclosing for the first time that he had performed testing on Nemir's actual seat belt, Defendants would need to re-depose Horton. (Docket No. 140, 3/30/01 Hearing Tr. at 4-5, 10.) Second, the Court determined that the Sixth Circuit had affirmed that part of its earlier decision excluding Horton's testing on the exemplar buckle under *Daubert*, but allowed Plaintiff to brief the issue. (*Id.* at 14.) Third, the Court observed that it was curious for the Sixth Circuit to say that all of the 188 customer complaints referenced in Plaintiff's appeal addressed "intermittent partial latching" when Plaintiff did not raise that argument in the district court and the district court made no finding as to those 188 customer complaints. (*Id.* at 17.) Rather, the Court determined, "the whole area of customer complaints has got to be examined, and an attempt should be made to find where . . . the phraseology, analogist [sic] to intermittent partial latching . . . . So the plaintiff must be given a full opportunity to meet that with that as a background." (*Id.* at 18.) Finally, the Court addressed Defendants' request that a protective order be entered regarding the protocol for contact with their customers, giving Plaintiff 10 days to respond to Defendants' request, and ordering that Plaintiff not contact Defendants' customers during that 10 day period. (*Id.* at 21-23.)

On April 18, 2001, the Court continued its March 30th hearing on Defendants' motion for a protective order setting the protocol for discovery in connection with customer

50

complaints previously produced by Defendants.  Plaintiff explained that he submitted the 188 customer complaints to the Sixth Circuit "as examples" of the types of complaints raised by Defendants' customers that Plaintiff found to be "relevant, . .  responsive, and in some instances even selected randomly."[12]  (DX WW, 4/18/01 Hrg. Tr. at 8.)  The Court responded:

> but, we have to start somewhere, and I read -- <u>and I don't mean to say that if your further investigation into these 188 complaints requires still an enlarged investigation beyond that, that that's open for consideration, but I do believe, since the focus is on the 188 as I read the [*Nemir I*] opinion -- the 188 complaints, we should start with them</u>.
>
> <u>I'm not indicating in any way, [Plaintiff's counsel], that it should be limited to that.</u>

(*Id.* at 11 (emphasis added).).

When Plaintiff's counsel inquired whether the Court meant that the 188 customer complaints referenced by the Sixth Circuit would be a "preferred launching point", the Court responded, "Yes." (*Id.* at 11-12.)  Plaintiff conceded that the problem with this was he did not know what 188 complaints the Sixth Circuit was referencing.  (*Id.* at 12.)  The Court then concluded that a protective order was necessary in this case to protect Defendants from being unduly burdened and unfairly prejudiced if customer interviews were allowed to be conducted ex parte.  (*Id.* at 13-14.)  It determined that this result was consistent with the Sixth Circuit's decision because it allowed Plaintiff to depose all 188 customers that filed complaints that the Sixth Circuit identified as potentially relevant.  (*Id.* at 14.) When Plaintiff

---

[12]The Joint Appendix supplied to the Sixth Circuit Court of Appeals in connection with the *Nemir I* appeal reveals that Plaintiff submitted 288 alleged similar incidents.  The Sixth Circuit did not identify which of the 288 claims or complaints that were submitted made up the 188 potentially involving "intermittent partial unlatching."

informed the Court that "[t]here are more, substantially more than 188", the Court replied, "and if that's true and you need more than 188, you can further address me on that. . . . I'm going to start out with 188."  (*Id.* at 25.)  In its proposed order, the Court provided that if the parties came back to the Court and said they need to take additional testimony, that request would be entertained.  "I'm starting out only with the 188 . . . ."  (*Id.* at 27.)

On April 18, 2001, a Protective Order was entered by the Court (1) allowing Plaintiff to take depositions of all 188 complainants identified by the Sixth Circuit as potentially relevant, or such reduced number as the parties agreed to depose; (2) requiring Defendants to be present at these depositions; (3) requiring counsel to confer as to the names and address of complainants; and (4) requiring depositions to be completed within 90 days or, if more time is requested, such time as the Court orders.  (Docket No. 138, 4/18/01 Protective Order.)

On May 2, 2001, the above Protective Order was amended to add that "[n]either party should have any *ex parte* communication with ay of the 188 complainants."  (Docket No. 143, 5/2/01 Am. to Protective Order (filed April 18, 2001).)

On July 12, 2001, the Court held a status conference.  As to discovery with regard to the 188 complainants discussed earlier, Plaintiff's counsel informed the Court, "we believe we have successfully made it through the 180 some -- actually it was more than 188 customer complaints. . . .  We're just starting the depositions.  And there were a lot of people who were not home, unable to contact," and Plaintiff asked the Court to "expand the search to people who were involved in accidents where their safety belts went -- let go. . . .  Well, we originally agreed to the 188.  I'm saying expand it into the boxes, but narrow the scope from people who've just complained their safety belt came off while driving."  (DX

52

SS, 7/12/01 Tr. at 16-19.)  The Court then extended the time to depose the initial 188 complainants, and then told Plaintiff "[t]hen if you need to expand this discovery further, come back to me on it." (*Id.* at 20-21.)  Plaintiff's counsel replied that they believed that that was fair and were "in complete agreement with that concept." (*Id.* at 21.)

Plaintiff's counsel determined which claimants he wanted to contact, and Plaintiff's and Defendant's counsel jointly contacted these consumers by telephone.  They jointly went down a list of claimants and made the calls via speaker phone while sitting in a conference room together, contacting 51 customers.  (DX A, Fresard Aff. at ¶ 17.)  After several of these joint phone calls, Plaintiff's counsel decided not to call any more of them and instead elected to proceed with depositions.  Of those 51 claimants jointly contacted, Plaintiff's counsel elected to take the depositions of 13.  Plaintiff was not prevented from deposing more or from contacting more claimants by telephone.  (*Id.* at ¶ 18.)

On April 16, 2002, a final pretrial hearing was held.  Plaintiff agreed to limit the number of "other similar incident" (OSI) witnesses that he would call at trial to nine.  (DX TT, 4/16/02 Hrg. Tr. at 50-51.)

At the May 2002 trial, Plaintiff said they were offering only five OSI witnesses.  (DX UU, 5/13/02 Trial Tr. IV at 171.)  Defense counsel recalls that only three OSI witnesses were called:  Morris, Carney, and Ellerbe.  (DX A, Fresard Aff. at ¶ 19.)

A jury trial commenced in May 2002 and resulted in a jury verdict in favor of Defendant Mitsubishi, with the jury finding that Plaintiff was not wearing his seat belt at the time of his accident.

On July 4, 2002, the district court entered judgment for Mitsubishi.

Plaintiff appealed, and on **August 20, 2004**, the Sixth Circuit reversed and remanded for a new trial.

This matter is now before the Court on the Sixth Circuit's mandate that it consider Plaintiff's motion for sanctions against Mitsubishi for discovery abuses and determine whether (1) any discovery misconduct occurred; and (2) if yes, to what extent any misconduct prejudiced Nemir.  *Nemir IV*, 381 F.3d at 552-53.

## II.   Analysis

Plaintiff argues that sanctions against Mitsubishi[13] are appropriate under Fed. R. Civ. P. 37(b)(2).  Plaintiff contends that (1) Mitsubishi willfully committed discovery misconduct by failing to produce consumer complaints, warranty claims, and its investigation of those consumer complaints and claims as required in response to Plaintiff's Document Request Nos. 15, 26, 76 and 77 from December 22, 1997 through May 1999; (2) this discovery misconduct prejudiced Plaintiff by delaying his ability to adequately and thoroughly investigate the claims revealed in the requested documents; and (3)  Mitsubishi should be sanctioned for discovery misconduct that prejudiced his case.  Plaintiff urges the Court to issue one of two sanctions:  (1) enter a default judgment against Mitsubishi on the issue of liability; or (2) preclude all evidence of Mitsubishi's restraint experts at the new trial and instruct the jury that Mitsubishi:

> intentionally withheld customer complaints and internal investigations during discovery in this case which could show that partial engagement of the Takata 52 series buckle could occur by a technique representative of actual use.  You

---

[13]Plaintiff argues for sanctions against Mitsubishi in some parts of his brief and against Mitsubishi and Chrysler in others.  Plaintiff voluntarily dismissed all claims against Chrysler on the eve of the May 2002 trial.  Accordingly, this opinion addresses Plaintiff's arguments for sanctions against Mitsubishi only.

54

are to infer that [Mitsubishi] intentionally withheld these documents because the customer complaints and internal investigations were adverse to [Mitsubishi] -- that being they would show that partial engagement does occur by a technique representative of actual use in the real world.

(Pl.'s Mot. at 23.)

Under Rule 37(b)(2) of the Federal Rules of Civil Procedure, a court may make an order refusing to allow a "disobedient party" to oppose designated claims or to prohibit that party "from introducing designated matters in evidence;" or render a default judgment against a "disobedient party."  Fed. R. Civ. P. 37(b)(2)(B) and (C).  Trial on the merits, however, is favored.  *Berthelsen v. Kane*, 907 F.2d 617, 620 (6th Cir. 1990).  Moreover, default judgments are granted as a last resort.  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993).

As observed by the Sixth Circuit:

> Rule 37(b)(2) provides that a district court *may* make any such order regarding the violation of a discovery order as is just.  The choice of what sanction to impose is vested in the court's discretion.  The court considers four factors in deciding whether to impose the drastic sanction of dismissal (against a plaintiff) or entering judgment (against a defendant):  (1) evidence of willfulness or bad faith; (2) prejudice to the adversary; (3) whether the violating party had notice of the potential sanction; (4) whether less drastic sanctions have been imposed or ordered.

*Phillips v. Cohen*, 400 F.3d 388, 402 (6th Cir. 2005) (citing *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995)).  Taking into consideration the above four factors, this Court denies Plaintiff's motion.

## A.  Plaintiff's Claims of Mitsubishi's Willfulness or Bad Faith

Despite Plaintiff's arguments to the contrary, this Court is not convinced that Mitsubishi willfully or in bad faith failed to cooperate with discovery in this case.  "A willful violation

55

occurs whenever there is a conscious and intentional failure to comply with [a] court order." *Bass v. Jostens, Inc.*, 71 F.3d 237, 241 (6th Cir. 1995).

The Court first observes, as the lengthy background section reveals, Plaintiff does not bring his motion with clean hands. After numerous attempts by Mitsubishi to have Plaintiff identify his defect claims and their factual bases so that it could adequately respond to Plaintiff's pending discovery requests, Mitsubishi filed a motion to compel. On June 30, 1998 and July 16, 1998, the Court ordered Plaintiff to file supplemental responses to Mitsubishi's discovery requests concerning Plaintiff's defect theories and determined that, until it found Plaintiff's responses adequate, it would not require Defendant to supplement its responses to Plaintiff's document requests. It was not until August 18, 1998, that the Court determined it would not require further supplementation from Plaintiff and ordered Mitsubishi to use its "best efforts" to supplement its responses to Plaintiff's document requests. Thus, any initial delay in Mitsubishi's supplemental responses must be attributed to Plaintiff's inadequate discovery responses concerning its defect claims and the Court's sequencing of discovery responses.

The Court next considers Mitsubishi's supplemental responses provided in two separate time periods: (1) from September 1998 through March 16, 1999; and (2) from March 16, 1999 through May 1999.

### 1.  Pre-March 16, 1999 Responses to Request Nos. 15 and 26

In September 1998, Mitsubishi, as ordered, supplemented its responses to Plaintiff's Request Nos. 15 and 26.[14]  Mitsubishi's counsel avers that it did its best to make sense of

---

[14]Plaintiff has never requested supplementation on Request Nos. 76 and 77 as he now claims.

56

Plaintiff's poorly-worded discovery requests and poorly-articulated defect claims. The Court agrees that Plaintiff's defect claims were poorly-articulated and that Plaintiff's Request Nos. 15 and 26 lacked clarity. Contrary to Plaintiff's arguments here, prior to March 16, 1999, it was not apparent that Request Nos. 15 or 26 sought the broad-ranging customer complaints, warranty claims, or investigative reports Plaintiff ultimately obtained in May 1999.

As to Request No. 15, Mitsubishi's counsel avers that, early in the discovery process, he advised Plaintiff's counsel that he did not view Request Nos. 15 and 26 as repetitive or seeking the same type of information, that he viewed Request No. 15 as seeking information that related to technical questions and matters arising as a result of inquiries prompted by Mitsubishi or Chrysler, rather than seeking information about claims or reports of injury initiated by others. (DX C, John Aff. at ¶ 23.) Mitsubishi's counsel further avers that it has always been counsels' understanding that Request No. 15 did not seek customer claim documents. (*Id.*) Plaintiff's March 8, 1999 motion for sanctions (the motion the *Nemir IV* Court held the district court should have addressed before trial) supports Mitsubishi's argument. Plaintiff's sanction motion addresses consumer claim discovery in response to Request No. 26, not Request No. 15. (Docket No. 104.) Likewise, Mitsubishi's responses to Request No. 15 were never mentioned at the November 17, 1998 hearing. The current motion is the first time Plaintiff argues that customer complaints fall within the scope of Request No. 15. Accordingly, Plaintiff has not shown that Mitsubishi willfully or in bad faith withheld such documents in its pre-March 16, 1999 responses to Request No. 15.

As to Request No. 26, Mitsubishi's counsel attests to the following. Counsel understood that Request No. 26 asked for documents regarding other "claims." (DX C,

John Aff. at ¶ 23.)  Early in the discovery process, Plaintiff's counsel was informed that Mitsubishi would frame its search for information responsive to Plaintiff's First RFPs "to be more reasonably related to the *Nemir* case accident and claims."  (DX C, John Aff. at ¶ 21.)  In particular, Plaintiff's counsel was advised that, in addition to the limitations already expressed in Request No. 26 ("Dodge" vehicles, same/similar seat belt system, serious or fatal injury, to front belted passenger), Mitsubishi "would focus on information about events that occurred before the accident date, situations involving the subject vehicle model and reasonably similar derivations thereof, matters related to a substantially similar type of accident or accident sequence, and involving an occupant in the same seating position as Plaintiff's, situations concerning the seat belt system in the subject vehicle model and reasonably similar derivations thereof, and occurrences involving the buckle type in the subject vehicle and reasonably similar performance, construction and configuration derivations thereof."[15]  (DX C, John Aff. at ¶¶ 21, 27, 31.)  Request No. 26, like Request 15, was unlimited as to time, scope, vehicle model, buckle type, or defect theory and was thus objected to as being overly broad, unduly burdensome, vague and ambiguous.  (*Id.* at ¶¶ 32, 33, 77.)  Thus, Mitsubishi searched for documents in response to Request No. 26 using the parameters that Nemir set out in Request No. 26 "coupled with those Plaintiff had suggested (and MMC had used all along with Plaintiff's knowledge) in his Emergency Motion filed in July, 1998."[16]  (DX C, John Aff. at ¶ 77.)

---

[15]Mitsubishi's counsel used the same parameters when searching for documents in response to Request No. 15.  (DX C, John Aff. ¶ 28.)

[16]In his July 1998 emergency motion to compel, Nemir's counsel complained that Mitsubishi's response to his first set of document requests, Request No. 26, was inadequate, arguing:

58

Based on "comments Plaintiff's counsel made about his knowledge of 'numerous lawsuits' against MMC and Chrysler such as this one," Mitsubishi's counsel concluded that Request No. 26 did not seek information about lawsuits and questioned Plaintiff's counsel about that conclusion. "Plaintiff's counsel confirmed that he already was aware of 'many lawsuits' against MMC and Chrysler involving claims of injury resulting from defective seat belt systems and air bags, and he did not need that information from MMC and Chrysler. Thus, it was understood that RFP 26 did not seek production of lawsuits" that had already been filed. (*Id.* at ¶¶ 24, 31.)

At a November 17, 1998 hearing, Plaintiff's counsel informed the Court that Mitsubishi had "information regarding consumer complaints" that it had failed to produce in response to Plaintiff's Request No. 26. (PX 11, 11/17/98 Hrg. Tr. at 17-18.) Mitsubishi's counsel (Craig John) responded that it found "no documents responsive to this request based on the seat belt buckle in this case, and . . . the nature of the claims involved in this case. In other words, partial latching or unlatching or anything of that nature." (*Id.* at 19-20.) He further responded, as an officer of the Court, that Mitsubishi had made a due diligence type search and had not found documents responsive to Request No. 26; had not found customer complaints as to the seat belt buckle in Nemir's car; but if such documents were subsequently found, they would be produced. (*Id.* at 23-25, 30-31.) The Court warned Mitsubishi's counsel that "Rule 37, and the sanctions that are implicit in that rule, would

---

As in most product liability cases, <u>discovery is not limited to the subject incident facts and circumstances. At a minimum, Defendants should produce documents (regarding other similar incidents) for their understanding of the accident.</u> . . .

(Docket No. 54, Nemir emergency motion to compel at 9 (emphasis added).)

make it difficult for you to introduce counteracting evidence to what the Plaintiff presented

if those particular documents were not furnished or came in at -- at an unduly late time."

(*Id.* at 31.)

> At to the above affirmations to the Court, Mitsubishi counsel avers that:
>
> It was my understanding at the time that <u>if the combined search parameters described in this Affidavit remained the same</u>, most likely no documents responsive to RFP 26 would be located. All of the statements made by me at that hearing regarding Defendants' document searches were specifically about RFP 26 and <u>were intended by me to reflect the defined and acknowledged scope searches outlined above for the responses to RFP 26</u>, (*see*, e.g., paragraphs 21, 31, 64, 71 and 77), and I reasonably understood that to be well known by all others. Those statements were and are true and correct. At no time did I ever indicate that documents responsive to the <u>far broader search later directed by the district court at the March 16, 1999 hearing . . . did not or would not "exist."</u>

(DX C, John Aff. at ¶ 79 (emphasis added).)  (*See also* DX D, Kelly Aff. at ¶¶ 21-23.)

Prior to March 16, 1999, the Court did not find Mitsubishi's discovery conduct to be

inadequate or improper and did not direct Mitsubishi to employ search parameters different

from those identified above.  Despite Plaintiff's arguments to the contrary, the claims

attached as Exhibits 16, 28-30, 39-94 to Plaintiff's motion include claims that were not

excluded by the pre-March 16, 1999 parameters used to search for "claim" documents

responsive to Request No. 26.  (DX OO, Chart of claim documents relied upon in Plaintiff's

Motion and reasons why not responsive to Request No. 26 pre-March 16, 1999.)

The same is true of the *McDaniel* litigation.  *McDaniel, et al. v. Mitsubishi, et al.*, Case

No. 97-CP-25-54, South Carolina Court of Common Pleas, Hampton County, South

Carolina.  The complaint in *McDaniel* was filed on January 23, 1997, and alleged only that

plaintiff McDaniel's buckle inadvertently and/or unintentionally released when his Mitsubishi

Montero was struck by another vehicle, slid sideways, and rolled over.  The complaint did

not specify why the buckle released and did not specify an alleged defect in the seatbelt buckle design. (Def.'s Supp. Resp., Ex. 1, Smith Aff. at ¶¶ 6-7.) During discovery, Mitsubishi served discovery requests on the plaintiffs in an attempt to flesh out the specifics of the defect allegation. (*Id.* at ¶¶ 8, 25.) Plaintiffs' responses did not articulate a theory of defect. (*Id.* at ¶ 10.) The South Carolina Court never ruled on Mitsubishi's motion to compel more specific discovery responses from the plaintiffs, and the plaintiffs never supplemented their discovery responses either formally or informally. (*Id.* at ¶ 31.) Because the *McDaniel* case ultimately settled, Mitsubishi never learned what the plaintiffs' alleged defect was in *McDaniel*. (*Id.* at ¶ 31.) Mr. Fryhofer, the plaintiffs' counsel in *McDaniel* was deposed by Nemir's counsel on April 28, 2005, and his testimony confirms the above. Mr. Fryhofer admitted that, in response to Mitsubishi's discovery requests, plaintiffs referred back to the allegations in their complaint. (Def.'s Supp. Resp., Ex. 2, Fryhofer Dep. at 32.) He also acknowledged that Mitsubishi had asked the plaintiffs to narrow their allegations. (*Id.* at 37-38.) Plaintiffs did not supplement their discovery responses or narrow their defect allegations as Mitsubishi requested. (Smith Aff. at ¶ 31.) The *McDaniel* case settled in November 1999, and Mitsubishi's counsel attests that, prior to settlement, the plaintiffs never disclosed to him what they "alleged to be defective about the seat belt, evidence they may have had that Mr. McDaniel was in fact wearing his seat belt prior to the accident, or why the seat belt allegedly inadvertently or unintentionally released." (*Id.* at ¶ 33.)

In light of the above, this Court finds that Mitsubishi did not willfully or in bad faith fail to cooperate with discovery when it provided Plaintiff with its supplemental responses to Request Nos. 15 and 26 during this time period. Moreover, this Court finds that

Mitsubishi's counsel did not willfully and in bad faith misrepresent its discovery responses at the November 1999 hearing.

At a March 16, 1999 hearing, in response to Plaintiff's continued argument that Mitsubishi had consumer complaints responsive to Request No. 26 but had not produced them, the Court ordered Mitsubishi's counsel to go and make the search "either in the documents you've obtained or in the documents you may have . . . <u>that show that partial latching has occurred in the way in which it occurred allegedly in this case</u>. . . . <u>I'm not asking you to furnish documents that don't say partial latching, I'm asking you to furnish documents that do allege partial latching.</u>"  (DX MM, 3/16/99 Hrg. Tr. at 39-40 (emphasis added).)  When Mitsubishi's counsel inquired whether the Court was ordering it to produce documents related to the recall of the Takata seat belt buckle dealing with the question of a broken piece of plastic in the buckle, the Court replied:

> I'm not talking about that.  I'm not talking about that.  I'm talking about partial latching. . . .  I'm not talking about broken latches. . . . I'm talking about partial latching, <u>where it's alleged, as the Plaintiff has alleged it here, that in using the seat belt buckle and inserting it, it's possible to have it partially latched, when it's apparent to the user that it seems to be fully latched.</u>"

(*Id.* at 41-42 (emphasis added).)  Nemir's counsel then protested:

> The recall documents with NHTSA, they involve numerous complaints of unlatching in accidents.  The Defendants, by their own representations both to NHTSA and to this Court, have contended that unlatching is not a possible outcome or a confirmed outcome from the push button phenomena, therefore, it stands to reason that there is some evidence of this partial latch condition in any case where there's been a latching complaint by a consumer.  I would appreciate it if the investigation [Mitsubishi's counsel] is to perform would take into account all of those complaints as well as –

(*Id.* at 42.)  The Court replied, "[i]f they involve partial latching allegations, yes."  (*Id.*)  "You understand what I'm asking [Mitsubishi] to do?  I want you to give them any documents that you have on partial latching claims. . . .  for this Takata latch. . . ."  (*Id.* at 48.)

The Court gave Mitsubishi's counsel until April 16, 1999 to produce a full version of those documents, not a redacted form.  (*Id.* at 38-39, 48.)  The Court never issued a written order.

Mitsubishi's counsel argues here that:

the district court interposed essentially new and different, better defined, yet much broader discovery, to include all MMC or Chrysler vehicles with TK-52 buckles and any claim showing that partial latching occurred in the way in which it is alleged to have occurred in this case. . . .  This eliminated almost all the parties' search criteria or parameters under RFP 26 (e.g., no longer <u>limited to:</u> <u>"Dodge" vehicles, same/similar seat belt system, serious or fatal injuries, to front</u> <u>seat belted drivers, before the date of this accident, in the same or similar</u> <u>vehicle, involved in a similar accident type, etc.)  Therefore, the post-March 16,</u> <u>1999 "claims" discovery was very different from discovery ever previously</u> <u>requested or responded to previously in this case.</u>

(DX C, John Aff. at ¶ 80 (emphasis in original); (DX D, D. Kelly Aff. at ¶¶ 23-24.)  This Court agrees.  On March 16, 1999, documents responsive to Request No. 26 were broadened by the district court to include all MMC or Chrysler vehicles with TK-52 buckles and any claim showing that partial latching occurred in the way in which it is alleged to have occurred in this case.   All previous parameters set by either party were eliminated.

On April 13, 1999, in response to the Court's March 16, 1999 order, Mitsubishi filed a Report of Compliance.[17]  Contrary to Plaintiff's arguments here, Mitsubishi did not refuse to produce documents.  Rather, it filed a report summarizing and explaining how it had

---

[17]The Report was filed on behalf of both Mitsubishi and Chrysler.  As Mitsubishi is the only remaining Defendant in this case and thus the only party that will be affected by the court-imposed sanctions Plaintiff seeks, the Court refers solely to Mitsubishi.

63

complied with the Court's directions given at the March 16, 1999 pre-trial conference.  (DX

NN.)  First, it reiterated the Court's direction that it search for and produce documents it

may have showing claims of partial latching of "TK52" series buckles in a way it is alleged

to have occurred in this case.  (*Id.* at 3.)  Mitsubishi next observed that this search was

considerably broader than that previously done in response to Plaintiff's discovery requests:

> In Request No. 26 (Plaintiff's First Request for Production to Defendants), Plaintiff sought production of other complaints or claims involving only "Dodge" vehicles and claims of "serious injuries" to front seat occupants only, and the responses to that discovery Request were further limited, by properly served objections, to the relevant time frame and to substantially similar accidents and vehicles.  The search directed by the Court on March 26, 1999 is not limited to just "serious injuries," and it includes all Defendants' vehicles equipped with the "TK52" series buckle.  The only significant limitation to the search directed by the Court is that it is limited to <u>claims showing partial latching of the buckle in the way it is alleged to have occurred in this case.</u>

(*Id.* at 3-4 (emphasis in original) (citing 3/16/99 Tr. at 14-16, 34, 39, 41).).

Mitsubishi then described the search process and findings.  It explained that  the

search included reports of customer contacts and claims, legal claim and potential claim

files, lawsuits and warranty claims; specifically, legal claims, DaimlerChrysler Consumer

Activity Investigation Reports ("CAIRs"), Mitsubishi Customer Contact Reports ("CCR's"),

warranty claims, and NHTSA submissions by Chrysler and Mitsubishi.  (*Id.* at 4-7.)  As to

its "findings," Mitsubishi reported that:

> All the claims found that could have involved allegations of seat belt buckle unlatching, and thus were <u>potentially</u> responsive to a search for "claims of partial latching in the way it is alleged to have occurred in this case" . . . were found to fall into three general categories:
>
> (1)  Claims that the seat belt failed to "hold" or "restrain" a belted occupant;[18]

---

[18]Mitsubishi's counsel explains that this category of claims did not reveal the reason for the lack of restraint, and thus could have involved numerous parts other than the seat belt

(2) Claims that a seat belt buckle came unlatched, or would not latch properly, for a stated reason other than partial latching; and

(3) Claims that a seat belt buckle came unlatched in an unspecified manner, stating no claim of alleged cause or method of unlatching.

For the reasons outlined above, documents falling within any one of these three categories have not been produced to Plaintiff because they do not show claims that partial latching occurred in the manner alleged to have occurred in this case. Therefore, with the exception of [CAIRs and NHTSA Submissions] described . . . in this Report, Defendants have not produced any documents to Plaintiff responsive to the search for production directed by the Court on March 16, 1999. Defendants have not found any documents that they believe show or demonstrate claims responsive to the Court's above-described direction.

(Id. at 7-8 (emphasis in original).)

Mitsubishi represented that, by not producing such documents, it was "not attempting to hide their existence." (Id. at 10.) Rather, it was "affirmatively disclosing the existence of claim documents within each of the three categories outlined above" and stating its position that "such documents are not responsive to the Court's direction that Defendants produce claims showing or alleging that partial latching occurred in the way it is alleged to have occurred in this case." (Id.)[19]

---

buckle; i.e., seat belt retractors, seat belt webbing, or a multitude of other non-buckle parts, and thus were considered not responsive to the Court's March 16, 1999 search criteria. (DX A, Fresard Aff. ¶ 12.)

[19]In Nemir IV, the Sixth Circuit erroneously states that, "[o]n April 13, 1999, Mitsubishi admitted that it possessed, but had not previously disclosed, approximately 4,000 customer contact reports documenting complaints, along with approximately 25,000 warranty claims about the partial latching of the seatbelts." 381 F.3d at 544 (emphasis added). As the record reflects, Mitsubishi's April 13, 1999 Report to the Court revealed that its search for "potentially responsive" documents uncovered 29,000 documents, none of which specifically alleged claims of "partial latching" but rather either alleged a reason other than partial latching or alleged unspecified reasons as to why a seat belt failed to "hold," "restrain," or otherwise came unlatched; i.e., those documents in categories (1), (2) and (3).

On April 22, 1999, Plaintiff filed an emergency motion to compel compliance with the March 16, 1999 order of Court and to adjourn the April 27, 1999 hearing date on Defendants' motions for summary judgment.  (Docket No. 114.)   Plaintiff argued that Mitsubishi failed to comply with the Court's order because, despite its review of 29,000 potentially responsive documents; i.e.:  "(a) All its legal claim files regarding seat belt litigation for vehicles equipped with the Takata 52 series belt"; "(b) Its Customer Contact Report computerized database and approximately **4,000** potentially responsive reports contained therein"; and "(c) Approximately **25,000** seat belt warranty claims **potentially involving unlatching** of this belt buckle", Mitsubishi produced zero documents to Plaintiff. (*Id.* at 4 (emphasis in original).)

Plaintiff conceded that he "has never sought and does not now seek production of documents identified in Defendants' category (2); i.e., claims that a seat belt buckle came unlatched, or would not latch properly, for a stated reason other than partial latching. Plaintiff did, however, argue that he had previously requested documents identified by Defendants in category (1) -- claims that the seat belt failed to "hold" or "restrain" a belted occupant -- and category (3) -- claims that a seat belt buckle came unlatched in an unspecified manner, stating no claim of alleged cause or method of unlatching. Accordingly, Plaintiff requested that the Court compel Mitsubishi to produce those documents.  (*Id.* at 8.)

On April 26, 1999, Defendants responded, arguing that they had complied with the Court's March 16, 1999 directive to search for and produce, if found, documents showing

66

claims that partial latching occurred in other incidents in the way alleged to have occurred in this case.  (Docket No. 115.)

On April 27, 1999, the Court issued an Order requiring Defendants to "make available forthwith to plaintiff documents" described in its categories (1) and (3).  It gave Plaintiff until May 18, 1999 to review the documents, and adjourned the hearing on motions for summary judgment until May 21, 1999.  (Docket No. 116, 4/27/99 Order granting Plaintiff's motion to compel and to adjourn.)  The Court did not determine that Mitsubishi had failed to comply with its March 16, 1999 order.  (*Id.*)

On April 30, 1999, Defendants filed a motion for clarification and for protective order. (Docket No. 117.)  Defendants sought clarification of the Court's April 27, 1999 Order so as to ensure that their actions properly comply with that order, and where appropriate, entry of a protective order.   Specifically, Defendants explained that four groups of "claim" documents were included in their review:  (1) DaimlerChrysler CAIRs; (2) Mitsubishi warranty claims; (3) Mitsubishi customer contact reports (CCRs); and (4) legal claims.  (*Id.* at 3.)  Defendants read the Court's April 27 Order to relate only to groups (2)-(4).

As to warranty claims, to insure prompt compliance, Defendants stated that it would be necessary to produce the entire group of approximately 25,000 documents to Plaintiff and reported Plaintiff's counsel did not object to this bulk production.  (*Id.*)  As to the CCRs, it would also be necessary to produce the entire set of 4,000 documents and Plaintiff's counsel likewise agreed to this bulk production.  (*Id.* at 4.)  As to legal claims, Defendants stated their concern that it would be impossible to make all legal claim documents falling with categories (1) and (3) by the date ordered.  Defendants also asserted that "accidents or incidents post-dating the plaintiff's injury are of little or no relevance to whether

67

Defendants had 'notice' of the partial engagement phenomenon as plaintiff claims it happened in this accident." (*Id.* at 4.)  Accordingly, they asked the Court for a protective order (1) limiting production of legal claims "to those incidents reported on or before the date of the subject incident (December 13, 1993), or grant more time for the production"; and (2) "prohibiting Plaintiff's counsel from contacting the MMC and DaimlerChrysler customers whose names appear on the documents produced." (*Id.* at 4-5.)

On May 4, 1999, the Court entered an Order granting in part and denying in part Defendants' motion for clarification and for protective order.  (Docket No. 118, 5/4/99 Order.)  The Court ordered Defendants to produce:  (1) all 25,000 warranty claims documents and 4,000 customer contact reports documents as stated in paragraphs 9 and 10 of Defendants' motion at the earliest possible date; and (2) all "legal claim documents" as ordered on April 27, 1999, "promptly and with reasonable dispatch." (*Id.*)  It denied Defendants' request to limit production of "legal claim documents" to those claims that pre-date Plaintiff's injuries and denied Defendants request for additional time.  Plaintiff was allowed until May 18, 1999, to review the contents of the documents produced, but was not allowed "to conduct further discovery by attempting to interview or contact complainants listed in these documents." (*Id.* at 2.)

On May 11, 1999, all documents were produced to Plaintiff.[20]  Other than in this post-August 2004 remand motion, Plaintiff never complained to the District Court that the production was incomplete, never moved for further production, and never claimed that the production was other than in full compliance with the Court's post-March 16, 1999 orders.[21]  More importantly, the Court at no time found Mitsubishi in non-compliance with any of its discovery orders.[22]

_____

[20]After remand, Mitsubishi further provided Plaintiff with a letter identifying the "causal and nature codes" used to identify the various reasons given for the warranty work in the warranty claim documents produced in May 1999.  These codes show that a multitude of reasons other than those that could be attributed to "partial latching" of the seat belt buckle. (DX VV, 2/8/02 letter from Mitsubishi's counsel to Plaintiff's counsel.)

[21]Despite this prior lack of protest, Plaintiff now raises new arguments, in his Motion, Reply, and at the May 9, 2005 hearing, that Mitsubishi is continuing to withhold information; i.e., the *McDaniel v. Mitsubishi Motors* suit filed on September 23, 1997 in South Carolina; field performance investigation review (FPIRs), investigation reports, and photographs regarding "prior incidents" (Mot. at 6-8; Reply at 3-4); and other information that is responsive to his discovery requests.

    If Plaintiff wishes to pursue its new arguments that Mitsubishi has still not complied with existing discovery requests, it should file a motion to compel, thus allowing the Defendant an opportunity to respond and allowing the Court an opportunity to properly address these new arguments apart from the remanded motion for sanctions at issue here.

[22]Plaintiff also makes numerous arguments concerning Mr. Kelly's conduct in other cases in an attempt to have the Court infer misconduct here.  The Court does not address these arguments as they are not probative of discovery conduct in this case. (Pl.'s Mot. at 10-11, n.8.)

    Plaintiff also uses newspaper articles to argue that this Court should infer that, because these articles report that Mitsubishi failed to comply with Japanese reporting requirements about vehicle defect claims, its counsel failed to comply with discovery in this case.  Again, the Court does not address these arguments, finding them not probative of the discovery conduct in this case. (Pl.'s Mot. at 13-16.)

### 3.  Responses to Request Nos. 76 and 77

Plaintiff's motion argues for the first time that Mitsubishi willfully and in bad faith failed to cooperate with discovery by not producing documents responsive to Request Nos. 76 and 77 from Plaintiff's Second Set of Document Requests.  This argument is without merit. Contrary to Plaintiff's representations here, Request Nos. 76 and 77 do not address claims or customer complaints.  Rather, Request No. 76 seeks production of "tests, data, reports, procedures or protocols involved in the analysis of 'partial latch' or 'false latch' phenomenon in the series TK-520 including the TK-523 specifically involving the belt tongue and the buckle mechanism."  Request No. 77 seeks production of "engineering drawings for the TK-520 series and documents denoting modifications, alterations or changes."

### 4.  Conclusion as to the First Rule 37(b)(2) Factor

In light of the above, this Court finds that Mitsubishi has not violated any Court order regarding discovery and has not willfully and/or in bad faith failed to cooperate with discovery in this case.  Even though this Court has found no misconduct or bad faith on the part of Mitsubishi, it will nonetheless examine Plaintiff's claims of prejudice.

### B. Plaintiff's Claims Of Prejudice

Plaintiff argues he was prejudiced by Mitsubishi's delayed production.  (Pl.'s Mot. at 16-24.)  The gist of Plaintiff's argument is that, if produced earlier, he would have had more time to examine and use these documents to:  (1) make a stronger case so as to defeat summary judgment; and (2) on remand, make a stronger case to prove his defect theory at trial.  As discussed above, this Court has determined that Mitsubishi did not willfully or in bad faith  delay production of the documents ultimately provided to Plaintiff in May 1999. Contrary to the cases Plaintiff relies on, Mitsubishi did not engage in a pattern of stubborn

70

refusal to comply with the Court's orders in this case.  In fact, this Court's review of the record shows otherwise.

To the extent Plaintiff is arguing that he was prejudiced by the district court's previous limitations on his ability to fully examine and use the documents produced by Mitsubishi in May 1999, the Sixth Circuit's reversal and remand address those claims of prejudice.  Any prejudice as a result of those actions are properly attributed to the district court, not any misconduct on the part of Mitsubishi.  That the district court agreed with Defendants on discovery issues that were later reversed does not transform the Defendants' actions into willful failure to cooperate with discovery.  Moreover, any prejudice to Plaintiff resulting from his inability to reach individuals mentioned in these documents is properly attributed to prior district court rulings and not to Mitsubishi.

Plaintiff has now had approximately eight months since the Sixth Circuit's August 20, 2004 remand to thoroughly examine all the documents produced by Mitsubishi in May 1999 and to attempt to contact individuals mentioned in those documents.  Other than speculation, Plaintiff has not shown that his examination of the documents and further investigation has been substantially hampered.  By the time this case is tried again, Plaintiff will have had these documents in his possession for over six years; ample time to study and evaluate them.[23]  Moreover, as the Sixth Circuit observed, the district court invited Plaintiff to return and ask to interview or depose additional complainants beyond the initial group of 188, but Plaintiff failed to do so.  (DX WW, 4/18/01 Hrg. Tr. at 11-12, 25, 27; DX

---

[23]This Court has extended discovery until October 1, 2005 and has set a January 10, 2006 trial date.

71

SS, 7/12/01 Hrg. Tr. at 20-21.)  Despite the District Court's invitation, Plaintiff never sought

to expand his investigation and thus cannot now blame Mitsubishi for his failure to do so.

### C.  Notice to Mitsubishi Re: Sanctions Requested and Imposition of Less Drastic Sanctions

The remaining factors identified by the Sixth Circuit to be considered before imposing

Rule 37(b)(2) sanctions are:  (1) "whether the violating party had notice of the potential

sanction;" and (2) "whether less drastic sanctions have been imposed or ordered."  *Phillips*,

400 F.3d at 402.  As to the first, while it is true that the District Court warned Mitsubishi that

it would not be allowed to use any documents it failed to timely produce, it was never

warned that it would be sanctioned in the manner Plaintiff advocates here.  (PX 11,

11/17/98 Hr. Tr. at 31.)  As to the final factor, the District Court never imposed or ordered

any less drastic sanctions against Mitsubishi.

In sum, after considering the record and each of the factors identified by the Sixth

Circuit, this Court concludes that the sanctions Plaintiff urges here are not warranted under

Rule 37(b)(2).

### III.  Conclusion

For the above stated reasons, Plaintiff's motion for sanctions is DENIED.




                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  May 11, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 11, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager