UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL NEMIR, M.D.,

    Plaintiff,

v.

MITSUBISHI MOTORS CORP.,

    Defendant.
                                     /

Case No. 96-75380

Honorable Nancy G. Edmunds

**ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S MOTIONS (1) TO EXCLUDE TESTING PERFORMED BY PLAINTIFF'S SEAT BELT EXPERT, KENNETH BROWN [438], AND (2) TO EXCLUDE TESTING BY COURT-APPOINTED EXPERT LINDLEY MANNING [440]**

At a hearing held on February 9, 2006, this matter came before the Court on Defendant's motions to (1) to exclude testing performed by Plaintiff's seat belt expert Kenneth Brown, and (2) to exclude testing by Court-Appointed Expert Lindley Manning. Being fully advised in the premises, having read the pleadings, and for the reasons stated on the record, Defendant's motions are DENIED WITHOUT PREJUDICE.

Defendant's motions argue that these experts' testing should be excluded because: (1) it does use "a technique representative of actual use" as required under 49 C.F.R. § 571.209, Part S5.5.2(g); and (2) it is inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Plaintiff argues otherwise.

Defendant's first argument raises several initial questions that the Court must answer: (1) who interprets federal safety standards and testing requirements; and (2) what may experts testify about with respect to those federal safety standards. These issues are

discussed below.

The Court first observes that although this is a strict liability case, Defendant can introduce evidence showing that it complied with FMVSS 209 under the consumer expectation test. Evidence of compliance, however, does not preclude Plaintiff from introducing evidence that Defendant should do more; i.e., that a seat belt buckle should never, under any circumstances, be capable of partial latching. *See Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898, 901 (7th Cir. 1994) (observing that "[c]ompliance with federal vehicle safety standards does not prevent a plaintiff from appealing to theories of products liability under the applicable state law of torts.").

The Court next observes that interpretation of federal regulations presents a question of law for the Court; not a question of interpretation for experts or a question of fact to be resolved by the jury. *See Bammerlin*. Thus, testimony by expert Manning about the interpretation of "representative of actual use" in 49 C.F.R. § 571.209 S5.2(g) is not admissible at trial. (Manning 3/15/02 Dep. at 58-60.) The same holds true for each of the parties' experts. None will be allowed to testify as to the correct interpretation of FMVSS 209 or the federal regulations related to that federal safety standard.

In *Bammerlin*, the Seventh Circuit Court of Appeals, applying Indiana law, addressed this issue in the context of an allegation that a seat belt assembly had a design defect (improper anchoring of one end to a door pillar and the other to the engine housing) that caused the plaintiff's injury. The plaintiff argued that "even if this placement of the anchorage was not negligent, it did not comply with federal safety standards." *Id.* at 900. The trial judge allowed the plaintiff's experts to testify as to how the standards should be interpreted. On appeal, the defendant argued this was reversible error. The Seventh

Circuit agreed, holding that "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Id.* at 900. The *Bammerlin* Court then determined that the plaintiff's experts had misinterpreted the relevant federal safety standards. *Id.* It concluded that "the district court either should have excluded the testimony or instructed the jury that as a matter of law [the defendant]'s seat belt assembly complied with federal requirements." *Id.* at 900-01.[1]

---

[1] The *Bammerlin* decision also provides some guidance on causation issues. The plaintiff's theory of the case was that "Bammerlin was belted, escaped serious injury in the cab, and was ejected and injured when he hit the ground." *Id.* at 899. The court observed that, even if the jurors concluded that the anchorage was defective and failed (thus loosening the seat belt), the plaintiff also needed some evidence showing how the plaintiff got out of the loosened belt. The plaintiff's experts theorized that, when the belt webbing loosened, it exposed the buckle, "which was then hit and unlatched by some flying object." *Id.* The Court rejected the defendant's argument that this was impermissible speculation, observing that:

> Bammerlin need not prove causation directly. He did not have high-speed cameras running in the cab at the time of the accident, and nothing else could have caught a flying object in the act. Instead he proceeded by eliminating the alternatives. We know that he wound up outside the cab. How did he get there? [The defendant]'s theory is that he was not wearing a seat belt. Bammerlin countered with his say-so, plus a physician's testimony that some of his injuries are more consistent with wearing a belt than with the hypothesis that he was not wearing one. ("Seat belt burn," the physician called it.) A biomechanics expert added that the injuries are most consistent with Bammerlin's being belted for *part* of the time during the crash. This is enough to permit a rational jury . . . to find that the belt disengaged during the crash. Engineers trying to understand a disaster often follow causal chains ("failure trees") until they find one that can account for the calamity. Sherlock Holmes observed that "when you have eliminated the impossible, whatever remains, however improbable, must be the trust". . . . Courts need not disdain a method that both engineers and detectives find useful.

*Id.* at 902 (internal citations omitted).

The *Bammerlin* decision provides this Court with guidance. "A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." *Id.* at 901 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). "All questions of testing method to one side, however, the initial step here was one of legal interpretation. What do the safety standards mean? The district judge should have resolved that question and provided the jury with the proper answer, so that experts for each side could address their testimony to the governing standards." *Id.* at 901.

Interpretation of federal safety regulations is the duty of the Court, not a question of fact for jurors. Thus, this Court must first interpret the relevant safety regulations and determine (1) whether ejector spring buckles are required to be tested for partial engagement under both Parts S5.2(g) and S4.3(g); and (2) what is meant by language in 49 C.F.R. §§ 571.209 S5.2(g), that testing for partial engagement is to be done "by means of any technique representative of actual use."

In the first trial of this matter, Judge Feikens made the following interpretation of FMVSS 209:

> [P]artial latching is referred to in FMVSS 209, codified at 49 C.F.R. § 571.209. Specifically, subsection 5.2(g) refers to a condition called "partial engagement":
>
>> "A metal-to-metal buckle shall be examined to determine whether partial engagement is possible by means of any technique representative of actual use. If partial engagement is possible, the maximum force of separation when in such partial engagement shall be determined."
>
> Section 571.209 S4.3(g) also provides:
>
>> "[A] metal-to-metal buckle shall separate when in any position of partial engagement by a force of not more than [five pounds]."

*Nemir v. Mitsubishi Motor Sales of Am.*, 60 F. Supp.2d 660, 665 (E.D. Mich. 1999) (quoting 49 C.F.R. § 571.209 S5.2(g) and S4.3(g)), *rev'd in part on other grounds*, No. 99-1907, 2001 WL 223775 (6th Cir. 2001). Judge Feikens did not interpret the phrase "by means of any technique representative of actual use" contained in Part S5.2(g).

As to Part S4.3(g), Judge Feikens observed that it was changed, effective May 27, 1999, so that the unit of force now used in that section is a newton (N). "A newton is 'the unit of force in the mks [meter-kilogram-second] system of physical units that is of such size that under its influence a body whose mass is one kilogram would experience an acceleration of one meter per second per second." *Id.* at 665, n.2 (quoting *Webster's Third New International Dictionary*, (1986)). "A force of five pounds is equivalent to approximately 22 N." *Id.*

He further explained that the "requirement of subsection S4.3 – that a partially engaged buckle ought to separate with a minimal amount of force, less than five pounds – may seem counterintuitive. . . . The rationale for the FMVSS 209 standard as it exists, however, is that a partially latched buckle should, given the ejector spring, the retractor system, and any movements of the use, 'pop out' during ordinary use, and thus 'inform' the user that the seatbelt was not properly latched in the first instance." *Id.* Plaintiff's theory of design defect is that the subject seat belt will partially engage and takes more than a reasonable amount of poundage to pull it out of partial engagement." *Id.* at 665.

By separate Order, this Court has instructed the parties to submit briefing on the issue of how these federal safety regulations should be interpreted by the Court. Accordingly, Defendant's request that testing by Manning and Brown be excluded because it does not satisfy the relevant federal safety regulations is DENIED WITHOUT PREJUDICE. This

Court must first interpret the relevant safety regulations. After that is accomplished, the Court will either exclude the testimony (if the testing does not comply with the regulations) or "instruct[] the jury as a matter of law [that the subject] seat belt assembly complied with the federal requirements." *Bammerlin*, 30 F.3d at 900-01.

The Court now addresses Defendant's second argument for excluding expert testing by Manning and Brown. It begins with Defendant's arguments concerning Court-appointed expert Manning.

### B. Application of *Daubert* to Manning's Testing

Defendant argues that Manning's testing is inadmissible under *Daubert*. The Sixth Circuit observes that, in its gatekeeping role, the district court is to consider the basis of an expert's opinion by evaluating: (1) whether the theory or technique can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential error rate and the existence and maintenance of standards controlling the technique's operation; (4) whether it has attracted widespread acceptance in a particular field; and (5) "whether the experts are proposing to testify about matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk So. RR Co.*, 105 F.3d 299, 303 (6th Cir. 1997).

Defendant argues that Manning's testing does not satisfy the relevance and reliability requirements of *Daubert* because he: (1) failed to properly record his test data, recording only successful attempts at partial engagement; (2) failed to photograph or videotape his tests; (3) clamped the buckle in a vise and cut a hole in the buckle housing to assist in

6

obtaining intentional partial engagement; (4) testified that he played around with the buckle until he got it into partial engagement; (5) provided no evidence that his testing was subject to peer review or publication; (6) failed to demonstrate a known error rate; (7) conducted his testing purely for litigation purposes; and (8) failed to show that his methodology has been generally accepted in the field of restraint engineering. Defendant bases this last argument on its claim that U.S. Testing Corp. and other companies performing U.S. government testing operate under the assumption that partial engagement testing is not necessary for "ejector spring" buckles.

Plaintiff responds that Manning's testing is admissible under *Nemir I and II* and *Daubert* because: (1) it is the same as used by Takata and U.S. Testing Corp. and is thus peer-reviewed and widely accepted; (2) it uses, in part, a Design Failure Mode Effect Analysis, which is a peer-reviewed recommended practice; (3) it is also based on generally-accepted "hazard analysis" methodologies, which have been peer-reviewed and published; and (4) it was not formulated for purposes of litigation because it follows the same methodology as Takata and U.S. Testing Corp.

To the extent Defendant's motion raises issues concerning the interpretation of federal safety regulations and presents a question of law for the Court, it is DENIED WITHOUT PREJUDICE.

This Court is mindful that this issue does not come to it with a blank slate. The Sixth Circuit Court of Appeals addressed issues concerning Court-appointed expert Manning's testimony, observing that:

> Nemir also sought to present testimony from court appointed expert Lindley Manning, who like Horton, was able to cause Nemir's buckle to partially latch. Federal Rule of Evidence 706 provides that a court

7

> appointed witness "shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party' *and the witness may be called to testify by the court of any party*." (emphasis added) Yet the district court, without explanation, prohibited Nemir from introducing Manning's testimony. . . . The rule simply does not condition a party's doing so on the district court's approval, nor does it maintain merely that the district court "may allow either party to call the witness."
>
> Manning's testimony would have been important to Nemir, for several reasons. First, it would have corroborated Horton's conclusions that the Nemir buckle was capable of partially latching and had been demonstrated to partially latch. Given that Manning was court-appointed, rather than hired by Nemir, a jury would likely have considered his testimony to be more credible than that of Horton, whom Mitsubishi derided as a "hired gun." Second, Manning's testimony that even infrequent partial latching may constitute a serious defect would have bolstered the weight afforded to Horton's research, which found partial engagement in two out of twenty attempts. The erroneous exclusion of this evidence again undercut Nemir's case.

*Nemir II*, 381 F.3d at 556. Accordingly, to the extent Defendant's motion seeks a ruling that does not follow the mandate from the Sixth Circuit in *Nemir II*, it is DENIED.

### C. Application of *Daubert* to Brown's Testing

Defendant also argues that the testing performed by Plaintiff's seat belt expert Kenneth Brown does not satisfy *Daubert* standards. At the hearing on this matter, Defendant indicated that it would inform the Court before Wednesday, **February 22, 2006**, whether it wants a *Daubert* hearing regarding Mr. Brown. If such a hearing is requested, it will be held on **February 22, 2006, at 2:30 p.m.** Accordingly, Defendant's motion as to Mr. Brown's testing is DENIED WITHOUT PREJUDICE.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: February 10, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 10, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager